UNITED STATES v. MOORE.

(Circuit Court of Appeals, Ninth Circuit. May 18, 1908.)

No. 1,518.

1. PUBLIC LANDS—ORIGINAL TITLE.

The original title to lands in the United States was not in the Indians; their rights being mere rights of possession or occupancy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 1.]

2. INDIANS — RESERVATION TREATY — CONSTRUCTION — INDIAN LAND — TITLE —EJECTMENT.

The Indian agreement of 1883 between the United States and Chiefs Moses and Sar-sarp-kin of the Columbia reservation provided for the removal of the tribe at their election, for their surrender of certain reservation lands, and for the allotment in severalty of one square mile of land to each head of a family or male adult, in the possession and ownership of which they should be guaranteed and protected. The agreement was ratified by Act Cong. July 4, 1884, c. 180, 23 Stat. 79, providing that, if the Indians elected to remain on the Columbia reservation, the Secretary of the Interior should cause the quantity of land stipulated in the agreement to be allowed them, which, when selected, should be held for the exclusive use and occupation of the Indians, and the remainder of the reservation be restored to the public domain. *Held*, that Indians to whom lands were allotted in severalty under such treaty acquired a mere right of possession and use, the title remaining in the United States, and that the government was therefore entitled to maintain ejectment against a third person, who had ousted the Indian allottees from possession.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indians, §§ 25–30.]

161 F.—33

In Error to the Circuit Court of the United States for the Eastern Division of the Eastern District of Washington.

For opinion below, see 154 Fed. 712.

A. G. Avery, U. S. Atty.

James F. Moore, E. K. Pendergast, and R. W. Starr, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The court below sustained a demurrer to the complaint in this case and dismissed it. The question for decision, therefore, is the sufficiency of that pleading. Upon its face it shows that the action was brought at the request of the Secretary of the Interior and the Commissioner of Indian Affairs and under the direction of the Attorney General. It alleges that, acting in accordance with Act Cong. July 4, 1884, c. 180, 23 Stat. 79, 80, entitled "An act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes, for the year ending June thirtieth, eighteen hundred and eighty-five, and for other purposes," the President of the United States did on May 1, 1886, by executive order set aside as an individual reservation in favor of and for one Quo-lock-ons, an Indian and a ward of the government, a certain specifically described tract of 640 acres, more or less, situate in Okanogan county, state of Washington; such land having been theretofore selected in accordance with the provisions of the act mentioned under the direction of the Secretary of the Interior and designated "Allotment No 7." The complaint further alleges that the tract in question was prior to such allotment a portion of the Columbia Indian reservation theretofore set aside by executive order for the use and occupancy of Indians; that the aforesaid Quo-lock-ons was, at the time the said individual reservation was so set aside for him, a member of the Columbia tribe of Indians, and resided in the state of Washington on the said Columbia Indian reservation; that during the year 1890 the said Indian, Quo-lock-ons, died intestate, leaving as his only heirs two sons, named, respectively, Frank, alias Dominique, Te-kom-tarl-ken, and Sam Pierre; that thereafter the said Sam Pierre died intestate, without issue, leaving a widow, named Jennie, who is an Indian, and a member of the Columbia tribe of Indians, and then and now residing on the said reservation. The complaint further alleges that at all times heretofore the plaintiff was and still is the owner in fee simple and entitled to the immediate possession of the said specifically described tract of land, subject only to the rights of the said Frank, alias Dominique, Te-kom-tarl-ken, and the said Jennie, to use and occupy the same as an individual Indian reservation and as wards of the plaintiff; that about the month of August, 1904, the defendant, without right or authority, entered upon and took possession of the said 640-acre tract of land, and ousted the said Frank, alias Dominique, Te-kom-tarl-ken, and the said Jennie, and the plaintiff therefrom, and ever since has unlawfully withheld, and still does unlawfully withhold, the possession thereof from the plaintiff and from the said Frank, alias Dominique

Te-kom-tarl-ken, and the said Jennie, to their damage in the sum of $2,000; that the value of the rents, issues, and profits of the premises from the month of August, 1904, and while the plaintiff has been excluded therefrom by the defendant, is $2,000. The prayer is for the recovery of the possession of the demanded premises, for the sum of $2,000 damages for the withholding of the possession thereof, for $2,000 as rents, issues, and profits of the land, and for the costs of the action.

It is manifest that the complaint states a perfect case, unless it be, as is contended on behalf of the defendant in error and as was held by the court below, that the plaintiff conveyed all of its right and title to the tract of land in controversy, and severed all of its relations to the Indians named, prior to the institution of the action. It is too late to talk about the original title to all of the lands in the United States having originally been in the Indians. The contrary was long ago settled. "Undoubtedly," said the Supreme Court in the comparatively recent case of Jones v. Meehan, 175 U. S. 18, 20 Sup. Ct. 4, 44 L. Ed. 49, "the right of the Indian nations or tribes to their lands within the United States was a right of possession or occupancy only. The ultimate title in fee in those lands was in the United States; and the Indian title could not be conveyed by the Indians to any one but the United States, without the consent of the United States"—citing Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681; Cherokee Nation v Georgia, 5 Pet. 1, 17, 8 L. Ed. 25; Worcester v. Georgia, 6 Pet. 515–544, 8 L. Ed. 483; Doe v. Wilson, 23 How. 457–463, 16 L. Ed. 584; United States v. Cook, 19 Wall. 591, 22 L. Ed. 210; United States v. Kagama, 118 U. S. 375–381, 6 Sup. Ct. 1109, 30 L. Ed. 228, Buttz v. Northern Pacific R. Co., 119 U. S. 55–67, 7 Sup. Ct. 100, 30 L. Ed. 330.

But the courts, as well as Congress, are careful to guard and protect the Indians in all of their rights; the Supreme Court saying, in Jones v. Meehan, supra, in respect to a treaty then under consideration:

"In construing any treaty between the United States and an Indian tribe, it must always (as was pointed out by the counsel for the appellees) be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians."

And in concluding a review of various of its previous decisions upon the subject the court, in the case from which the foregoing quotations have been taken, said:

"The clear result of this series of decisions is that when the United States, in a treaty with an Indian tribe and as part of the consideration for the

cession by the tribe of a tract of country to the United States make a reservation to a chief or other member of the tribe of a specified number of sections of land, whether already identified, or to be surveyed and located in the future, the treaty itself converts the reserved sections into individual property. The reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple; and that title is alienable by the grantee at his pleasure, unless the United States, by a provision of the treaty or of an act of Congress, have expressly or impliedly prohibited or restricted its alienation."

The question, then, for decision here is: Did Congress by its act of July 4, 1884, above referred to, in ratifying and confirming an agreement entered into on the 7th of July, 1883, between the Secretary of the Interior and the Commissioner of Indian Affairs and Chief Moses and other Indians of the Columbia and Colville reservations, in the then territory of Washington, part with the fee-simple title to the lands therein referred to, or leave the title thereto in the United States for the protection of the Indians in the exclusive use and occupation of such lands? The agreement is as follows:

"Agreement with the Columbia and Colville, 1883.

"In the conference with Chiefs Moses and Sar-sarp-kin, of the Columbia reservation, and Tonasket and Lot, of the Colville reservation, had this day, the following was substantially what was asked for by the Indians:

"Tonasket asked for a saw and grist mill, a boarding school to be established at Bonaparte creek to accommodate one hundred (100) pupils, and a physician to reside with them, and $100 (one hundred) to himself each year.

"Sar-sarp-kin asked to be allowed to remain on the Columbia reservation with his people, where they now live, and to be protected in their rights as settlers, and, in addition to the ground they now have under cultivation within the limit of the fifteen-mile strip cut off from the northern portion of the Columbia reservation, to be allowed to select enough more unoccupied land in severalty to make a total to Sar-sarp-kin of four square miles, being 2,560 acres of land, and each head of a family or male adult one square mile, or to remove onto the Colville reservation, if they so desire; and in case they so remove. and relinquish all their claims to the Columbia reservation, he is to receive one hundred (100) head of cows for himself and people, and such farming implements as may be necessary.

"All of which the Secretary agrees they should have, and that he will ask Congress to make an appropriation to enable him to perform.

"The Secretary also agrees to ask Congress to make an appropriation to enable him to purchase for Chief Moses a sufficient number of cows to furnish each one of his band with two cows; also to give Moses one thousand dollars ($1,000.00) for the purpose of erecting a dwelling house for himself; also to construct a sawmill and gristmill as soon as the same shall be required for use; also that each head of a family or each male adult person shall be furnished with one wagon, one double set of harness, one grain cradle, one plow. one harrow, one scythe, one hoe, and such other agricultural implements as may be necessary.

'And, on condition that Chief Moses and his people keep this agreement faithfully, he is to be paid in cash, in addition to all of the above, one thousand dollars ($1,000.00) per annum during his life.

All this on condition that Chief Moses shall remove to the Colville reservation and relinquish all claims upon the government for any land situate elsewhere.

"Further, that the government will secure to Chief Moses and his people, as well as to all other Indians who may go onto the Colville reservation and engage in farming, equal rights and protection alike with all other Indians now on the Colville reservation, and will afford him any assistance necessary to enable him to carry out the terms of this agreement on the part of

himself and his people; that until he and his people are located permanently on the Colville reservation his status shall remain as now, and the police over his people shall be vested in the military, and all money or articles to be furnished him and his people shall be sent to some point in the locality of his people, there to be distributed as provided. All other Indians now living on the Columbia reservation shall be entitled to 640 acres, or one square mile, of land to each head of family or male adult, in the possession and ownership of which they shall be guaranteed and protected; or, should they move onto the Colville reservation within two years, they will be provided with such farming implements as may be required, provided they surrender all rights to the Columbia reservation.

"All the foregoing is upon the condition that Congress will make an appropriation of funds necessary to accomplish the foregoing, and confirm this agreement, and also, with the understanding that Chief Moses, or any of the Indians heretofore mentioned, shall not be required to remove to the Colville reservation until Congress does make such appropriation, etc.

"H. M. Teller,
"Secretary of the Interior,
"H. Price,
"Commissioner of Indian Affairs.
his
"X Moses.
mark.
his
"X Sar-sarp-kin."
mark.

The act of Congress of July 4, 1884, provided as follows:

"For the purpose of carrying into effect the agreement entered into at the city of Washington on the seventh day of July, eighteen hundred and eighty-three, between the Secretary of the Interior and the Commissioner of Indian Affairs and Chief Moses and other Indians of the Columbia and Colville reservations, in Washington Territory, which agreement is hereby accepted, ratified, and confirmed, including all expenses incident thereto, eighty-five thousand dollars, or so much thereof as may be required therefor, to be immediately available: Provided, that Sar-sarp-kin and the Indians now residing on said Columbia reservation shall elect within one year from the passage of this act whether they will remain upon said reservation on the terms therein stipulated, or remove to the Colville reservation; and provided, further, that in case said Indians so elect to remain on said Columbia reservation the Secretary of the Interior shall cause the quantity of land therein stipulated to be allowed them to be selected in as compact form as possible, the same when so selected to be held for the exclusive use and occupation of said Indians, and the remainder of said reservation to be thereupon restored to the public domain, and shall be disposed of to actual settlers under the homestead laws only, except such portion thereof as may properly be subject to sale under the laws relating to the entry of timber lands and of mineral lands, the entry of which shall be governed by the laws now in force concerning the entry of such lands."

It is to be borne in mind that at the time of the agreement of 1883, and at the time of the act of Congress in question, section 2079 of the Revised Statutes was in force, declaring that:

"No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired."

The agreement of 1883 expressly recites that what Sar-sarp-kin asked for was—

"to be allowed to remain on the Columbia reservation with his people, where they now live, and to be protected in their rights as settlers, and, in addition to the ground they now have under cultivation within the limit of the fifteen-mile strip cut off from the northern portion of the Columbia reservation, to be allowed to select enough more unoccupied land in severalty to make a total to Sar-sarp-kin of four square miles, being 2,560 acres of land, and each head of a family or male adult one square mile, or to remove onto the Colville reservation, if they so desire; and in case they so remove, and relinquish all their claims to the Columbia reservation, he is to receive one hundred (100) head of cows for himself and people, and such farming implements as may be necessary."

And after the provisions with respect to Chief Moses and his people comes that so much relied upon by the defendant in error:

"All other Indians now living on the Columbia reservation shall be entitled to 640 acres, or one square mile of land, to each head of family or male adult, in the possession and ownership of which they shall be guaranteed and protected."

The agreement itself recites that it was entered into upon condition that Congress should confirm it, and necessarily only to the extent that Congress should confirm it. Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49; Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299.

Looking at the agreement alone, we do not think that either party to it could have understood from its language that it was contemplated that the government was to sever its relations to such of the Indians as should remain on the Columbia reservation, any more than with those who should remove to the Colville reservation—to cease to be their guardian. On the contrary, the agreement expressly recites that the Indians were to be "protected" by the government and by it guaranteed in the possession and ownership of the respective tracts of land to be set apart to them in severalty. How could the United States afford such protection but by remaining the guardian of the Indians? We think it the plain meaning of the agreement itself that it should do so, and that no party thereto could have otherwise understood. That it was to the interest of the Indians that the government should retain such title and continue as the guardian of the Indians was recognized by the learned judge of the court below, where he said in his opinion that his conclusion had—

"been reached with much reluctance, for no doubt it would be better for the Indians to sustain the plaintiff's contention. They are not qualified to cope with the white race, and the result of this decision, should it be sustained in the higher courts, will no doubt be prejudicial to their best interests. It is to be regretted that so commendable an effort should not have been made before the agreement received the approval of Congress, or at least before the rights of purchasers had attached; but the Supreme Court has said that the courts are not concerned with these considerations."

That Congress took the same view in respect to the interest of the Indians is, we think, manifest from its confirmatory act in question, in which it provided that, should the Indians then residing on the Columbia reservation elect within the time limited in the statute (one

year) to remain on that reservation, the Secretary of the Interior should cause the quantity of land, stipulated in the agreement to be allowed them, to be selected in as compact form as possible, "the same when so selected to be held for the exclusive use and occupation of said Indians." To be "held" by whom? Obviously by the United States, their guardian, and to the end that they might be "protected" against the tricks and acts of designing persons. Such act on the part of Congress was in accord with its general policy upon the subject; and that such is its true meaning finds strong support in the fact that the act was so construed by President Cleveland in his executive order of May 1, 1886, directing:

"That the tracts of land in Washington Territory surveyed for and allotted to Sar-sarp-kin and other Indians, in accordance with the provisions of said act of July 4, 1884, which allotments were approved by Acting Secretary of the Interior April 12, 1886, be, and the same are hereby set apart for the exclusive use and occupation of said Indians; the field notes of the survey of said allotments being as follows," etc.

It is further confirmed by the interpretation put by Congress itself upon the act of July 4, 1884, by its subsequent acts of March 3, 1905 (33 Stat. 1064, c. 1479), and of March 8, 1906 (34 Stat. 55, c. 629), providing for the conveyance of the government title by patents to certain of the allottees under the agreement and act in question. The legislative construction of its own act is always potent. "If it can be gathered," said the Supreme Court in U. S. v. Freeman, 3 How. 556–564, 11 L. Ed. 724, "from a subsequent statute in pari materia, what meaning the Legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute." And in the case of Philadelphia & E. R. Co. v. Catawissa R. Co., 53 Pa. 20, the Supreme Court of Pennsylvania said:

"If a contemporaneous construction by the Legislature of the same words can be discovered, it is high evidence of the sense intended."

That the acts of July 4, 1884, of March 3, 1905, and of March 8, 1906, above referred to, are in pari materia, is perfectly plain, for they relate to the same subject-matter and are parts of the same legislative purpose. In respect to such statutes, Sutherland, St. Const. 283, says:

"'All consistent statutes which can stand together, though enacted at different dates, relating to the same subject, and hence briefly called statutes in pari materia, are treated prospectively, and construed together, as though they constituted one act. This is true, whether the acts relating to the same subject were passed at different dates, separated by long or short intervals at the same session, or on the same day. They are all to be compared, harmonized, if possible, and, if not susceptible to a construction which will make all of their provisions harmonize, they are made to operate together, so far as possible, consistently with the evident intent of the legislative enactment."

And in Endlich on the Interpretation of Statutes, § 43, it is said:

"Where there are earlier acts relating to the same subject, the survey must extend to them; for all are, for the purposes of construction, considered as forming one homogeneous and consistent body of law, and each of which may explain and elucidate every other part of the common system to which it belongs."

The judgment is reversed, and the case remanded to the court below, with directions to overrule the demurrer to the complaint, with leave to the defendant to answer.