[No. 7863.   Decided March 9, 1909.]

## R. W. STARR, *Respondent*, v. LONG JIM *et al., Appellants.*[1]

INDIANS—LANDS—ALIENATION—TREATIES—CONSTRUCTION.   Under the so-called "Moses agreement" between certain Indian chiefs and the Federal government, in which the government agreed to guarantee and protect the Indians in the possession and ownership of certain lands, to be set apart to them in severalty, the title to the land, until patent issued to the Indians under a subsequent act of Congress, was in the government, in trust for the Indians, who had no power to alienate the lands; especially in view of the subsequent legislative construction by an act of Congress directing the lands "when so selected to be held for the exclusive use and occupancy of said Indians"; and Indian deeds before patent are void.

SAME—CONVEYANCE—VOID IN INCEPTION—AFTER ACQUIRED TITLE. A 'deed by Indians who had no power to alienate the lands, which is void in its inception because in violation of the laws of the United States, does not convey an after-acquired title by subsequent patents to the Indians, as the same do not inure to the benefit of the purchasers.

EQUITY—LACHES—RECOVERY OF REAL ESTATE—LIMITATION OF ACTIONS.   Laches will not bar a recovery of lands by Indians held under void deeds, within the statutory limitation for the commencement of the action.

JUDGMENT—DEFAULT—VACATION — DISCRETION — IMPEACHMENT BY JUDGE.   It is not an abuse of discretion to open a default judgment entered against Indians, and allow them to appear through the United States District Attorney to set aside fraudulent deeds; and having exercised the discretion, it is not competent for the trial judge to impeach the exercise thereof by a subsequent recital in a statement of facts to the effect that there was no sufficient excuse for the long delay in moving to open the default.

QUIETING TITLE—JUDGMENT—FORM—RESTORATION OF POSSESSION TO DEFENDANTS AND OF PURCHASE MONEY TO PLAINTIFF.   In an action to quiet title to Indian lands, in the possession of the plaintiff since

[1]Reported in 100 Pac. 194.

1900 under a void deed, judgment setting aside the deed and restoring possession should require repayment to the plaintiff of the purchase price paid to the Indians, together with a certain attorney's fee due him which was part of the purchase price, and had since outlawed, with interest from the date of payment, and any sums paid for taxes, less any amounts or things of value received by the plaintiff for the sale, use or lease of the lands.

Appeal from a judgment of the superior court for Chelan county, Steiner, J., entered March 31, 1908, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action to quiet title. Reversed.

*A. G. Avery* and *J. B. Lindsley*, for appellants.

*Reeves & Reeves* and *R. W. Starr*, for respondent.

RUDKIN, C. J.—On the 7th day of July, 1883, the Secretary of the Interior and the Commissioner of Indian Affairs, on the part of the United States, and chief Moses and other Indians of the Columbia and Colville reservations in the then Territory of Washington, entered into a certain agreement, subject to the approval of Congress, the material parts of which are as follows:

"In the conference with Chiefs Moses and Sar-sarp-kin, of the Columbia reservation, and Tonasket and Lot, of the Colville reservation, had this day, the following was substantially what was asked for by the Indians:

"Tonasket asked for a saw and grist-mill, a boarding school to be established at Bonaparte creek to accommodate one hundred (100) pupils, and physician to reside with them, and $100 (one hundred) to himself each year.

"Sar-sarp-kin asked to be allowed to remain on the Columbia reservation with his people, where they now live, and to be protected in their rights as settlers, and in addition to the ground they now have under cultivation within the limit of the fifteen-mile strip cut off from the northern portion of the Columbia reservation, to be allowed to select enough more unoccupied land in severalty to make a total to Sar-sarp-kin of four square miles, being 2,560 acres of land, and each head of a family or male adult one square mile, or

to remove onto the Colville reservation, if they so desire; and in case they so remove, and relinquish all their claims to the Columbia reservation, he is to receive one hundred (100) head of cows for himself and people, and such farming implements as may be necessary.

"All of which the Secretary agrees they should have, and that he will ask Congress to make an appropriation to enable him to perform.

"The Secretary also agrees to ask Congress to make an appropriation to enable him to purchase for Chief Moses a sufficient number of cows to furnish each one of his band with two cows; also to give Moses one thousand dollars (1,-000.00) for the purpose of erecting a dwelling house for himself; also to construct a sawmill and gristmill as soon as the same shall be required for use; also that each head of a family or each male adult person shall be furnished with one wagon, one double set of harness, one grain cradle, one plow, one harrow, one scythe, one hoe, and such other agricultural implements as may be necessary.

"And, on condition that Chief Moses and his people keep this agreement faithfully, he is to be paid in cash, in addition to all of the above, one thousand dollars ($1,000.00) per annum during his life.

"All this on condition that Chief Moses shall remove to the Colville reservation and relinquish all claims upon the government for any land situate elsewhere.

"Further, that the government will secure to Chief Moses and his people, as well as to all other Indians who may go onto the Colville reservation and engage in farming, equal rights and protection alike with all other Indians now on the Colville reservation, and will afford him any assistance necessary to enable him to carry out the terms of this agreement on the part of himself and his people; that until he and his people are located permanently on the Colville reservation his status shall remain as now, and the police over his people shall be vested in the military, and all money or articles to be furnished him and his people shall be sent to some point in the locality of his people, there to be distributed as provided. All other Indians now living on the Columbia reservation shall be entitled to 640 acres, or one square mile, of land to each head of family or male adult, in the possession and ownership of which they shall be guaranteed and pro-

tected; or, should they move onto the Colville reservation within two years, they will be provided with such farming implements as may be required, provided they surrender all rights to the Columbia reservation.

"All the foregoing is upon the condition that Congress will make an appropriation of funds necessary to accomplish the foregoing, and confirm this agreement, and also, with the understanding that Chief Moses, or any of the Indians heretofore mentioned, shall not be required to move to the Colville reservation until Congress does make such appropriation, etc."

This agreement was ratified and confirmed by the Act of Congress of July 4, 1884, 23 United States Statutes at Large, 79-80, which reads as follows:

"For the purpose of carrying into effect the agreement entered into at the city of Washington on the seventh day of July, eighteen hundred and eighty-three, between the Secretary of the Interior and the Commissioner of Indian Affairs and Chief Moses and other Indians of the Columbia and Colville reservations, in Washington Territory, which agreement is hereby accepted, ratified, and confirmed, including all expenses incident thereto, eighty-five thousand dollars, or so much thereof as may be required therefor, to be immediately available: *Provided*, That Sar-sarp-kin and the Indians now residing on said Columbia reservation shall elect within one year from the passage of this act whether they will remain upon said reservation on the terms therein stipulated, or remove to the Colville reservation: *And provided further*, That in case said Indians so elect to remain on said Columbia reservation the Secretary of the Interior shall cause the quantity of land therein stipulated to be allowed them to be selected in as compact form as possible, the same when so selected to be held for the exclusive use and occupation of said Indians, and the remainder of said reservation to be thereupon restored to the public domain, and shall be disposed of to actual settlers under the homestead laws only, except such portion thereof as may properly be subject to sale under the laws relating to the entry of timber lands and of mineral lands, the entry of which shall be governed by the laws now in force concerning the entry of such lands."

On the 11th day of August, 1894, in conformity to this agreement and the Act of Congress ratifying the same, the Secretary of the Interior set apart for the exclusive use and occupation of the defendant Long Jim a certain allotment on the Columbia reservation, a part of which is involved in this action. The act of Congress of March 3, 1905, 33 U. S. Statutes at Large, p. 1064-5, authorized the Secretary of the Interior to issue a patent to the defendant Long Jim for the land embraced in his allotment, in the following language:

"That the Secretary of the Interior be, and hereby is, authorized and directed to issue a patent in fee to Long Jim for the lands heretofore allotted to him by the Secretary of the Interior on April eleventh, eighteen hundred and ninety-four, as modified and changed by Department order of April twentieth, eighteen hundred and ninety-four, under and by virtue of the agreement concluded July seventh, eighteen and eighty-three, by and between the Secretary of the Interior and the Commissioner of Indian Affairs and Chief Moses and other Indians of the Columbia and Colville reservations, commonly known as the 'Moses agreement,' accepted, ratified, and confirmed by the Act of Congress approved July fourth, eighteen hundred and eighty-four (Twenty-third Statutes, pages seventy-nine and eighty), and under the decision of the General Land Office of July ninth, eighteen hundred and ninety-two, affirmed by the Department of the Interior January sixth, eighteen hundred and ninety-three, to wit: the northeast quarter, northeast quarter of the southeast quarter and lot one of section eleven, the northwest quarter and southwest quarter of the southwest quarter of section twelve, lot one of section fourteen, and lots one and two of section thirteen, township twenty-seven north, range twenty-two east, Willamette meridian, Washington, free of all restrictions as to sale, incumbrance, or taxation."

On August 2, 1905, a patent was issued pursuant to the authority granted by the last-mentioned act. On March 29, 1900, the defendants conveyed a portion of their allotment to the plaintiff in this action, by warranty deed, in consideration of the sum of $2,000. The plaintiff entered into

possession of the granted premises about a year after the execution of the deed, and has continued in possession ever since. This action was instituted for the purpose of quieting his title to the land described in his deed as against the claims and demands of the defendants. A judgment by default was taken against the defendants for failure to answer, but the default was afterwards opened, on motion of the defendants appearing through the United States attorney for the Eastern District of Washington, and the defendants were permitted to answer and defend, on condition that they pay $75 as costs, and that the cause be heard and determined in the state courts, which conditions were assented to and complied with. The answer of the defendants attacked the validity of the deed under which the plaintiff claims, on the ground of fraud in its procurement, and on the further ground that the deed was void in its inception, because at the date of its execution the title to the land therein described was in the United States, and the defendants had no right, power, or authority to convey the same. The court below made findings of fact and conclusions of law in favor of the plaintiff, and gave judgment accordingly. From that judgment, the defendants have appealed.

In view of the conclusion we have reached on certain legal questions involved in the case, we deem it unnecessary to enter upon a discussion of the facts. At the time the conveyance under which the respondent claims title was executed, the United States held the title to the land sought to be conveyed, in trust for the Indian appellants, and had stipulated in the Moses agreement, and the act of Congress confirming the same, that the Indians should be guaranteed and protected in the possession and ownership thereof. How could the government guarantee and protect the Indians in the possession and ownership of the property if the Indians were at liberty to divest themselves of that ownership and possession through a voluntary conveyance? The nature of the Indian claim to these allotted lands was fully con-

sidered by the United States Circuit Court of Appeals for this Circuit in the case of *United States v. Moore*, 161 Fed. 513. It was there held that the Indian acquired a mere right of possession through the allotment, that the legal title remained in the United States until after patent, and that the United States could maintain an action of ejectment against a third person who had ousted the Indian allottee from possession. In the course of its opinion the court said:

"Looking at the agreement alone, we do not think that either party to it could have understood from its language that it was contemplated that the government was to sever its relations to such of the Indians as should remain on the Columbia reservation, any more than with those who should remove to the Colville reservation—to cease to be their guardian. On the contrary, the agreement expressly recites that the Indians were to be 'protected' by the government and by it guaranteed in the possession and ownership of the respective tracts of land to be set apart to them in severalty. How could the United States afford such protection but by remaining the guardian of the Indians? We think it the plain meaning of the agreement itself that it should do so, and that no party thereto could have otherwise understood. That it was to the interest of the Indians that the government should retain such title and continue as the guardian of the Indians was recognized by the learned judge of the court below, where he said in his opinion that his conclusion had 'been reached with much reluctance, for no doubt it would be better for the Indians to sustain the plaintiff's contention. They are not qualified to cope with the white race, and the result of this decision, should it be sustained in the higher courts, will no doubt be prejudicial to their best interests. It is to be regretted that so commendable an effort should not have been made before the agreement received the approval of Congress, or at least before the rights of purchasers had attached; but the supreme court has said that the courts are not concerned with these considerations.'

"That Congress took the same view in respect to the interest of the Indians is, we think, manifest from its confirmatory act in question, in which it provided that, should the Indians then residing on the Columbia reservation elect within the time limited in the statute (one year) to remain on that

reservation, the Secretary of the Interior should cause the quantity of land, stipulated in the agreement to be allowed them, to be selected in as compact form as possible, 'the same when so selected to be held for the exclusive use and occupation of said Indians.' To be 'held' by whom? Obviously by the United States, their guardian, and to the end that they might be 'protected' against the tricks and acts of designing persons. Such act on the part of Congress was in accord with its general policy upon the subject; and that such is its true meaning finds strong support in the fact that the act was so construed by President Cleveland in his executive order of May 1, 1886, directing:

" 'That the tracts of land in Washington Territory surveyed for and allotted to Sar-sarp-kin and other Indians, in accordance with the provisions of said act of July 4, 1884, which allotments were approved by Acting Secretary of the Interior April 12, 1886, be, and the same are hereby set apart for the exclusive use and occupation of said Indians; the field notes of the survey of said allotments being as follows,' etc.

"It is further confirmed by the interpretation put by Congress itself upon the act of July 4, 1884, by its subsequent acts of March 3, 1905 (33 Stat. 1064, c. 1479), and of March 8, 1906 (34 Stat. 55, c. 629), providing for the conveyance of the government title by patents to certain of the allottees under the agreement and act in question. The legislative construction of its own act is always potent. 'If it can be gathered,' said the supreme court in *U. S. v. Freeman*, 3 How. 556-564, 11 L. Ed. 724, 'from a subsequent statute in *pari materia*, what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.' And in the case of *Philadelphia & E. R. Co. v. Catawissa R. Co.*, 53 Pa. 20, the supreme court of Pennsylvania said:

" 'If a contemporaneous construction by the legislature of the same words can be discovered, it is high evidence of the sense intended.'

"That the acts of July 4, 1884, of March 3, 1905, and of March 8, 1906, above referred to, are in *pari materia*, is perfectly plain, for they relate to the same subject-matter

and are parts of the same legislative purpose. In respect to such statutes, Sutherland, St. Const. 283, says:

" 'All consistent statutes which can stand together, though enacted at different dates, relating to the same subject, and hence briefly called statutes *in pari materia,* are treated prospectively, and construed together, as though they constituted one act. This is true, whether the acts relating to the same subject were passed at different dates, separated by long or short intervals at the same session, or on the same day. They are all to be compared, harmonized, if possible, and, if not susceptible to a construction which will make all of their provisions harmonize, they are made to operate together, so far as possible, consistently with the evident intent of the legislative enactment.'

"And in Endlich, Interpretation of Statutes, § 43, it is said:

" 'Where there are earlier acts relating to the same subject, the survey must extend to them; for all are, for the purposes of construction, considered as forming one homogeneous and consistent body of law, and each of which may explain and elucidate every other part of the common system to which it belongs.' "

This language is utterly inconsistent with any right or authority in the Indian allottee to convey the land or divest himself of the ownership and possession before patent. The Moses agreement and the several acts of Congress relating to these Indian lands, being *in pari materia,* must be construed together, and it may well be asked why did Congress provide, five years after the conveyance under which the respondent claims, that the government patent should be free from all restrictions as to sale, encumbrance, or taxation if no such restrictions had existed prior to that time. It seems to us that there can be no question that the Moses agreement and these several acts of Congress clearly evince the long-established policy of the government to retain a guardianship over these Indians and to hold their lands in trust for them, to protect them against their ignorance and improvidence and "against the tricks and acts of designing persons." If so, the attempt on the part of the appellants

to dispose of their allotment, and the attempt on the part of the respondent to acquire the title, were alike violative of the spirit and purpose of the laws of the United States, and it is the duty of every court to declare such conveyances null and void. *Coey v. Low*, 36 Wash. 10, 77 Pac. 1077; *Melchoir v. McCarty*, 31 Wis. 252, 11 Am. Rep. 605; *Smith v. Stevens*, 10 Wall. 321, 19 L. Ed. 933.

If the deed was void in its inception because in contravention to the laws of the United States, it was void for all purposes, and cannot convey an after acquired title. As said by the court in *Atkinson v. Bell*, 18 Tex. 474:

"The rule that where a vendor has not title, and sells, any title afterwards procured by him will inure to the benefit of the purchaser, does not apply in cases where such sale was prohibited by law. Such favor shown to a purchaser at a prohibited sale would thwart and defeat the policy of the government."

See, also, *Holmes v. Johns*, 56 Texas 41; *Bank of America v. Banks*, 101 U. S. 240, 25 L. Ed. 850.

Something is said in the briefs about the question of laches, but there is nothing in this record to bar the appellants from asserting their title to these lands at any time within the period prescribed by the statute of limitations.

The respondent contends that the court abused its discretion in opening the default and admitting the appellants to defend, and in support of this contention we are referred to the following statement embodied in the certificate to the statement of facts:

"And the court further certifies at the request of the plaintiff and over the objection of defendants, exceptions to which are allowed defendants, that in the consideration and decision of the motion of defendants to vacate the original judgment, that I was convinced from the affidavits used and the showing made on said motion that there was no excuse for the defendants not appearing and defending in time or for their long delay in moving against the default thereafter, but was of the opinion that notwithstanding this, it would

be a proper matter to investigate the allegations of fraud mentioned in defendants' motion to set aside said judgment."

Why should the question of fraud be investigated if the investigation could not be made effective by the rendition of a final judgment? We think the court below acted well within its discretion in setting aside the default and permitting the appellants to answer, and it should not be permitted to impeach or undermine its previous ruling by a statement inserted in its certificate to the statement of facts months afterwards.

It only remains to consider the form of judgment to be entered after the remand of the case to the court below. The prayer for relief in the answer is as follows:

"Wherefore, these defendants pray for a judgment and decree herein that the plaintiff take nothing; that the above described lands, and each and every part thereof, are the property of, and owned by the defendants, free and clear of, and from all claim, or claims of said plaintiff, or any one claiming through or under him, and that all cloud, or clouds on said defendants' title may be removed and cleared; provided, however, that before such decree shall become of full force and effect, the defendants shall pay into court for said plaintiff the sum of fifteen hundred and twenty-five dollars ($1,525.00) with legal interest thereon from the day on which said sum was paid by the plaintiff to said defendants, as stated in the complaint.

"That if it should be determined in said action that said plaintiff had collected or secured any money or other article, or property of value for the sale, use or lease of said real estate, or any part thereof, that these defendants have judgment against the plaintiff for the amount thereof with legal interest thereon, against which judgment the aforesaid sum of fifteen hundred and twenty-five dollars ($1,525.00) and interest may be proportionately and properly an offset."

We think that judgment for the appellants should go as prayed, except in two particulars. If the respondent has paid any taxes levied after the land became legally subject to taxation, these should be included in the amount to be paid by the appellants, with legal interest; and we think

in equity the attorney fee of $500, which constituted a part of the consideration for the deed, should likewise be included, with interest. The record shows that the attorney fee was justly due and owing to the respondent at the time the deed was executed; the respondent has relied upon the conveyance as a satisfaction of his claim and has taken no steps to otherwise enforce it; the claim is now barred by the statute of limitations, and the respondent is remediless unless this court interposes in his behalf, and we think that equity and good conscience require that we should do so. With this modification the judgment is reversed, with directions to enter judgment in favor of the appellants according to the prayer of their answer.

GOSE, FULLERTON, CROW, CHADWICK, MOUNT, and DUN-BAR, JJ., concur.