UNITED STATES et al. v. ASHTON et al.

(Circuit Court, W. D. Washington, W. D.   April 19, 1909.)

No. 1,397.

1. INDIANS (§ 10\*)—LANDS—ORIGINAL RIGHT OF OCCUPANCY.

The Indians have a right to occupy the country inhabited by them to the exclusion of white people, until their rights shall have been relinquished by them or terminated by laws enacted by Congress.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 25; Dec. Dig. § 10.\*]

2. PUBLIC LANDS (§ 1\*) — GOVERNMENT OWNERSHIP — ORIGIN AND NATURE OF TITLE.

The government of the United States is the primary source of title to all land within all territory acquired by national authority, and Congress has plenary power to dispose of it.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 1.\*]

3. NAVIGABLE WATERS (§ 36\*)—LANDS UNDER WATER—OWNERSHIP BY STATE.

The Oregon country was acquired by the United States with the object in view of creating new states to be admitted into the Union on an equality with the original states, and until the states now existing in that country were organized and admitted the national government held the title to the shores and beds of navigable waters therein as trustees for the future states. If there is any exception to this general rule, it must rest upon

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a special grant expressly authorized by a law enacted by Congress to provide for some peculiar requirement of the national government.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 36.*]

4. NAVIGABLE WATERS (§ 36*)—LANDS UNDER WATER—OWNERSHIP BY STATE.

As the original states which ordained our national constitution succeeded to the ownership of the shores and beds of navigable waters within their boundaries which previous to their separation from the mother country appertained to the British Crown, so states later admitted to the Union on an equality with them became vested with a like ownership as an attribute of sovereignty, to be exercised for the benefit of all of the people.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 36.*]

5. NAVIGABLE WATERS (§ 37*)—TIDE LANDS—GRANTS BY STATE.

The space bordering the shores of the sea and navigable inlets and harbors which may be reclaimed from the sea and devoted to beneficial uses without obstructing navigation or detriment to the paramount rights of the public is valuable, and may be granted to individuals by the state in the exercise of its sovereign power.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 203; Dec. Dig. § 37.*]

6. BOUNDARIES (§ 15*)—NAVIGABLE WATERS.

Under the laws of the United States in surveys of public lands bordering on navigable waters, the shore lines are meandered, and in general all grants and conveyances of such lands by the government give title only to land above the line of ordinary high water.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 108–117; Dec. Dig. § 15.*]

7. INDIANS (§ 10*)—LANDS—RIGHTS AS ORIGINAL OCCUPANTS.

The aboriginal inhabitants of the country now composing the United States were not seised of titles to real estate.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 25; Dec. Dig. § 10.*]

8. INDIANS (§ 11*)—LANDS—EXTINGUISHMENT OF INDIAN TITLE.

All exclusive rights of the Puyallup Indians as occupiers of land in the Oregon country were terminated by Oregon Donation Act Sept. 27, 1850, c. 76, 9 Stat. 496, and were relinquished by them by the treaty of December 26, 1854, 10 Stat. 1132.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 11.*]

9. BOUNDARIES (§ 15*)—NAVIGABLE WATERS.

The executive order of President Pierce in 1857 setting apart lands bordering on Commencement Bay in Oregon Territory as a reservation for the Puyallup Tribe of Indians did not grant any right or title to shore lands, which could only be done by Congress for some national purpose; and in any event, under the provision of the treaty of December 26, 1854, 10 Stat. 1132, which vested in the President the power to change and relocate the reservation, the subsequent allotment and conveyance in severalty of the lands therein in accordance with a survey made under Act May 29, 1872, c. 233, 17 Stat. 186, in which the shore line was meandered and the lands allotted extended only to the line of ordinary high tide, had the effect of extinguishing any rights of the tribe as a community to tide lands, if any such previously existed.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 108–117; Dec. Dig. § 15.*]

10. INDIANS (§ 10*)—LANDS—DISCLAIMER OF TITLE BY STATE.

The provision of Const. Wash. art. 26, by which the state forever disclaimed "all right and title * * * to all lands * * * owned or held by any Indian or Indian tribes," cannot operate in any way as a grant or conveyance of title by the state, but its utmost effect is to bar the state

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and its vendees from claiming land owned or held in exclusive possession by Indians or tribes at the date of the adoption of the Constitution.
[Ed. Note.—For other cases, see Indians, Dec. Dig. § 10.*]

Suit in equity to determine adverse claims to land situated in the rim of Tacoma Harbor between the line of high tide and deep water. Heard on the bill of complaint and the answers of the several defendants. Decree for the defendants.

B. S. Grosscup, Sp. Asst. Atty. Gen., and Chas. Bedford, for the United States.

W. P. Bell, Atty. Gen., for the State of Washington.

Ashton & Hayden, Edward E. Cushman, and W. H. Doolittle, for defendants.

HANFORD, District Judge.    Upon the hearing of an application for an order referring this case to the master in chancery for the taking of evidence, the defendants by their solicitors contended vigorously that such reference is unnecessary, and the merits of the case were very fully presented as if the hearing had been upon the bill and answers of the defendants, and upon due consideration the court finds that the controversy involved is easily determinable from conclusions deducible from the pleadings, together with indisputable facts of general notoriety and public documents and records of which the court takes judicial notice.

The attitude of the respective parties as well as the rights which they assert must be defined in order to make a clear statement of the issues. The government of the United States appears as a complainant, not to maintain any distinct right menaced by the defendants, but merely to give its sanction to the litigation in the capacity of general guardian and protector of the Indians. The other complainants are Indians, formerly members of the Puyallup Tribe; each of them has received an allotment of land within the boundaries of the reservation for the Puyallups, and become a citizen of the United States and of the state of Washington, entitled to all the rights, privileges, and immunities of citizens and subject to the laws of the state by virtue of the provisions of an act of Congress commonly referred to as the "Dawes Act" (Act Feb. 8, 1887, c. 119, 24 Stat. 390; 1 Supp. Rev. St. 536).

They sue as individuals and as trustees, representing all the surviving members and heirs of deceased members of their tribe. The tribe, although disintegrated by the enfranchisement of its members, has not been by any formal proceeding dissolved, and the complainants, as individuals, have interests, and as trustees represent the interests of all the other Puyallup Indians, in the community property and rights of their tribe. The bill of complaint avers that all the land which is the subject of controversy is such community property, and that each of the defendants wrongfully claims title adversely to them to specified tracts thereof. The substantial part of the prayer of the bill is as follows:

"And that each of said defendants be required to set forth any and every adverse interest claimed or demanded in or to said premises, to the end that

the same be justly adjudicated and declared null and void against these plaintiffs, and that the defendants have not or has either of them any estate or interest in the said property or any part thereof, and that these plaintiffs be declared and decreed to be the owner in fee of said premises and accretions, and entitled to the sole and exclusive right and possession thereto, free and clear from any claim of the defendants thereto, and that the defendants and each and every one of them be forever barred from asserting or claiming any estate or interest therein, and that they and each of them be restrained and enjoined from entering into possession of or interfering with the possession or occupancy of these plaintiffs, or doing any of the acts and things hereby sued to be enjoined."

By section 1, art. 17, of its Constitution:

"The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, * * * provided, that this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state."

Merely to maintain its claim of sovereignty, the state has intervened as a party and joined the defendants in disputing the contention of the complainants.

The defendants respectively claim title in severalty to tracts and parcels of the land in controversy as vendees of the state, and pray for a decree confirming and quieting said titles against the claim asserted by the Indian complainants.

The title asserted by the Indian complainants, if valid, must be founded upon prescription or continuous exclusive possession, or else be deraigned from one of the following ultimate sources, viz.:

(a) The aboriginal title; that is to say, the rights of the Indians as first occupiers of the country.

(b) The government of the United States, which by the acquisition of new territory became vested with the paramount title to all the land.

(c) The state of Washington, which by virtue of its sovereignty is the recognized owner of the shores and beds of all navigable waters within its boundaries not granted, ceded, or otherwise disposed of by its authority.

The following well-established rules of law must control the decision of the case:

First. The Indians have a right to occupy the country inhabited by them to the exclusion of white people, until their rights shall have been relinquished by them, or terminated by laws enacted by Congress. Hot Springs Cases, 92 U. S. 703, 23 L. Ed. 690; Beecher v. Wetherbee, 95 U. S. 517, 24 L. Ed. 440.

Second. The government of the United States is the primary source of title to all lands within all territory acquired by national authority, and the Congress has plenary power to dispose of it. Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681; Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565. In this connection the word "land" is to be given its proper definition, so that the rule will be consistent with the rules hereinafter stated.

Third. The Oregon country was acquired by the United States, with the object in view of creating new states to be admitted into the Union upon an equality with the original states, and, until the states now existing within that country were organized and admitted

into the Union, the national government held the title to the shores and beds of navigable waters therein, as trustee for the future states. Pollard v. Hagan, 3 How. 212, 11 L. Ed. 565. If there is any exception to this general rule, it must rest upon a special grant expressly authorized by a law enacted by Congress to provide for some peculiar requirement of the national government. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331.

Fourth. The assertion of ownership in the shores and beds of navigable waters within its boundaries, made by the state of Washington, is founded upon the doctrine that no individual can acquire a proprietary right to any part of the sea, because the sea is a highway of commerce for the whole world, and the coast within the range of cannon shot is the limit of national dominion. Therefore jurisdiction of the seacoast and of all navigable inlets and bays is an attribute of sovereignty to be exercised for the general welfare of all people, and as the original states, which ordained our national Constitution, succeeded to the jurisdiction within their respective boundaries, which previous to their separation from the mother country appertained to the British Crown, the state of Washington at the time of its admission into the Union on an equality with them became vested with like jurisdiction.

Fifth. The space bordering the shores of the sea and navigable inlets and harbors which may be reclaimed from the sea, and devoted to beneficial uses without obstructing navigation, or detriment to the paramount rights of the public, is valuable, and may be granted to individuals by the state in the exercise of its sovereign power.

Sixth. The laws of the United States enacted by Congress for the parceling and disposition of the public domain prescribe a system of subdivision into 40-acre tracts and fractions. The lands are surveyed by running township and section lines, and establishing corner posts or monuments. The surveys of land bordering navigable water terminate at the line of ordinary high water. The shores are meandered to ascertain sinuosities, and all tracts which are cut into by shore lines are platted as fractional lots. In general, all grants and conveyances by the government give title only to land above the line of ordinary high water. Mann v. Tacoma Land Co. (C. C.) 44 Fed. 27; s. c., 153 U. S. 273, 14 Sup. Ct. 820, 38 L. Ed. 714. Whatever exceptions there may have been to this rule in actual transactions do not in any way affect the issues in this case.

The material facts to which these fundamental principles must be applied for the purpose of determining the rights of the parties herein are as follows:

The exclusive feature of the rights of Indians as occupiers of the country within the boundaries of Oregon Territory, which as originally organized included this state, was terminated by the act of Congress creating Oregon Territory, and the act of September 27, 1850, c. 76, 9 Stat. 496, familiarly known as the "Oregon Donation Law," because those acts were designed to encourage families to emigrate from the states and become permanent inhabitants of Oregon. Notwithstanding that fact, however, the government subsequently made treaties with the Indians whereby they relinquished their rights to all

170 F.—33

land in this region not specifically held in reserve for their use. A treaty was made with the Puyallups and allied tribes December 26, 1854. 10 Stat. 1132. By that treaty the land designated as a reservation for the Puyallups comprised 1,280 acres on the west side of Commencement Bay, but it was never surveyed as a reservation nor occupied as such. Governor Stevens selected for the tribe a much larger and better body of land through which the Puyallup river flows into Commencement Bay, and caused it to be surveyed and a map made, showing its exterior boundaries, a photographic copy of which map is here exhibited.

The lands so selected, surveyed, and mapped were, by an order made by President Pierce in the year 1857, set apart as a reservation for the Puyallups in lieu of the 1,280 acres designated by the treaty, and was accepted by them. As shown by the map, part of the north and west boundaries follow the shore of Commencement Bay, but instead of adhering strictly to the shore line, part of the west boundary was a straight line cutting across points of land and indentures of the bay.

After the government survey of the township in which this reservation is situated had been made, President Grant by an executive order dated September 6, 1873, extended the reservation so as to include therein a fractional lot of section 34 situated west of the straight line, said fraction being all of the upland contiguous to the straight line not previously included. Subsequently all of the reservation as extended, except a tract reserved for agency purposes situated south of the Puyallup river, was cut up into lots and surveyed and platted and allotted to the Indians in severalty, and patents were issued to the allottees. This survey and platting of the reservation was pursuant to authorization by Congress, which by an appropriation act approved May 29, 1872 (Act May 29, 1872, c. 233, 17 Stat. 186), appropriated $150,000 for the survey of the exterior boundaries of Indian reservations and subdividing portions of the same. The survey and plat were duly approved and became a public record in the General Land Office of the United States in the year 1874. In making this survey the straight line constituting part of the west boundary as shown by Governor Steven's map was disregarded, and the boundary was traced following the sinuosities of the shore in conformity to the general system of public land surveys, so that only the land above the line of ordinary high tide was included in the reservation and platted.

By the treaty of 1854 the Indians were guaranteed the right of taking fish at all usual and accustomed grounds and stations, in common with all citizens of the territory, and of erecting temporary houses for the purpose of curing; and although denied by the defendants, it will be assumed as a fact for the purpose of this decision that the Indians were accustomed to resort to the shallow water adjacent to the reservation as fishing grounds. But they have never made other use of the tide land involved in this controversy, nor held corporeal possession thereof.

In the year 1873 Tacoma was designated as the Western terminus of the Northern Pacific Railroad, and before the adoption of our state Constitution it had grown to be an important commercial city. It has continued to grow and still grows; Commencement Bay is its harbor, and its shore lands between high and low water are of great value as sites for industrial works, and especially for terminal grounds for other railroads having projected lines extending to the city.

Under authority of the state these so-called tide lands have been platted, with projected streets intended to preserve the public right of free access to the harbor from the city and from the allotted lands of the Indians.

Article 26 of the Constitution of the state of Washington is a compact with the United States, by which the state makes the following disclaimer:

"That the people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries of this state, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States. * * * "

Pursuant to Act Cong. Aug. 19, 1890, c. 807, 26 Stat. 354, a commission consisting of three eminent citizens was appointed to visit the Puyallup reservation and make a full investigation regarding it, with reference to specified points, including the following:

(1) The nature of the title to, and value of, the lands allotted in severalty. (2) Whether there are any common lands which have not been allotted, and, if so, the value of the same and of the interest of the Indians therein. (3) Whether such reservation embraces the land on Puget Sound between high and low water mark.

The commission made a report which was submitted to Congress by President Harrison, with an accompanying letter written by Hon. John W. Noble, Secretary of the Interior (Ex. Doc. No. 34, 52d Cong. 1st Sess). The Secretary's letter contains the following statements:

"Upon the receipt of the report of the commission it was referred to the Assistant Attorney General for this department for his opinion in regard to the conclusions arrived at by the commission. It was also referred to the Indian Office for an expression of opinion as to the views adopted by the commission.

"On comparing the several views thus obtained, I find quite a divergence of opinion on some of the points of investigation by the commission; and upon a careful consideration of them all, as fully set forth in the papers transmitted herewith, my views as to the propositions, taken in their regular order, are as follows: * * * As to whether the reservation embraces the land between high and low water mark.

"The Assistant Attorney General and the commission agree that the land below high-water mark is not embraced in the reservation, while the Commissioner of Indian Affairs thinks differently, as he believes it was the intention of the executive order to embrace it. In my judgment all that was granted by the executive order was contained in legal subdivisions only, which extended only to the meander line; which line did not extend to low-water mark."

After the report of the commission had been submitted, Congress made provision for the sale of such allotted lands as the allottees did not need for homes, and for the platting and sale of part of the agency tract. Act March 3, 1893, c. 209, 27 Stat. 633. Pursuant to that law a commission was appointed to select the lands to be sold and manage the sale thereof, and said functions of the commission have been executed with the approval of the Secretary of the Interior, and with apparent respect to the opinion of Secretary Noble, holding that the Indians have no right to tide lands.

The defendants are bona fide purchasers from the state of the lands involved in this litigation.

A very good decision of this case could be made in a short paragraph, stating the simple proposition that the complainants are not entitled to prevail, for the reason that they have failed to set forth in their bill of complaint any deed, grant, law, treaty, record, or prescriptive right evidencing any color of title in the Puyallup Tribe of

Indians as a community to any part of the shore lands involved in this litigation, nor have they made even a pretext of right by virtue of actual exclusive possession thereof. The foregoing statement of legal principles and narrative of facts has been made, however, because of the large interests involved, and out of respect for the learned lawyers who have laboriously and in good faith prepared the case and submitted it for adjudication.

The conclusions deducible from the premises are as follows:

(a) The aboriginal inhabitants of this country were not seised of titles to real estate. Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681; United States v. Cook, 19 Wal. 591, 22 L. Ed. 210; Buttz v. Northern Pac. R. Co., 119 U. S. 55, 7 Sup. Ct. 100, 30 L. Ed. 330; United States v. Moore, 161 Fed. 513, 88 C. C. A. 455. All exclusive rights of the Indian complainants, as original occupiers of the country, were terminated by the Oregon donation law, and were relinquished by them by the treaty of 1854.

(b) Any disposition of proprietary rights in the seashore by the government of the United States, being obnoxious to the firmly established principle that control of the seacoast is an attribute of sovereignty appertaining to the states, could only be valid, if valid at all, by virtue of the exercise of the power vested in Congress to be exercised for the national welfare, and there is no pretext set forth in the bill of complaint or stated in the argument of the complainants' solicitors that any proprietary right to shore lands became vested in the Puyallup Tribe as a community by virtue of any provision, expressed or implied, of any act of Congress whatever. The treaty of 1854 was not in any sense a conveyance of title to any of the lands in controversy to the Puyallup Indians; on the contrary, the treaty was a relinquishment by said Indians of whatever rights to these lands may have been theretofore claimed by them. For the reasons already stated, the President could not grant shore lands by the making of an executive order designating the tract of land to be held as a reservation, and the executive orders made by President Pierce and President Grant, referred to in this opinion, cannot by any rule of interpretation or construction be made to express an intention, on the part of either President, to effect an object other than that of setting apart land for the use of the Indians for whatever period of time it might be required for such use, and the orders referred to do not purport to fix the boundaries of the reservation irrevocably or permanently. They were made in the exercise of authority expressly assented to by the Indians in the treaty of 1854, vesting in the President the power to change and relocate the reservations, and by the approval of the survey and platting of the reservation, which was in legal effect the act of the President, the western boundary originally indicated by the straight line of Governor Steven's map was changed to a line following the sinuosities of the shore at ordinary high tide. The patents issued to the Indian allottees for designated tracts to be held in severalty, conveyed no proprietary rights in any land to the Puyallup Tribe as a community nor any incidental rights other than, or different from, the rights comprised within ordinary and usual conveyances, by patent, of land bordering tidal waters, which do not

convey the title to the shore land beyond the ascertained line of ordinary high tide. Every one of those patents extinguished all the rights of the tribe as a community with respect to the tract of land conveyed by it. The fishing rights secured to the Indians by the treaty, were by its express declaration a mere privilege to be enjoyed in common with all citizens and logically antagonistic to any claim of an exclusive or adverse right, and entirely lacking in all of the essentials of a grant of an inheritable estate.

The whole argument in support of the complainants' contentions is reduced to conciseness in the criticism of the report of the Puyallup commission made by Mr. T. J. Morgan, Commissioner of Indian Affairs, as follows:

"I cannot accept the view of the commissioners in relation to the ownership of the lands on Puget Sound lying between high and low water mark.

"It appears to me that the government in selecting this particular tract of land situated upon the borders of Puget Sound as a home for the Puyallup Indians, and throwing about them the lines of a reservation as a separation between them in their home, on the one hand, and all others on the outside of that line on the other, had in mind, primarily, the isolation of these people temporarily and their protection under the specific care of the government, until they could reach the point of self-protection. I can hardly think that the government designed to withhold from these people any rights or privileges of any kind whatever which could ordinarily attach to an act of government vesting in them the right and title to this particular body of land. If the government had intended to reserve to itself or for another the right and title to the lands lying between high and low tide bordering upon the reservation, I think that fact would have been expressly stated in the executive order extending the reservation.

"On the other hand, the letter of the Acting Commissioner of Indian Affairs, dated August 26, 1873, in asking for the extension of the boundaries of the reservation (see pamphlet, Executive Orders to Indian Reservations Prior to April 1, 1890, p. 88), stated expressly that 'this would give them a mile of water frontage directly north of Puyallup River, and free access to the waters of Commencement Bay at that point.'

"The executive order issued by President Grant, September 6, 1873, extending the reservation in accordance with the request of the Acting Commissioner, confirmed, as it seems to me, specifically, this express stipulation, and thus secured to the Indians, beyond any question, any and all right and title to any land whatever lying between them and the deep water.

"It is worthy of note, also, as stated by the commission on the authority of Agent Eells, that at the head of Commencement Bay there are patented tracts, portions of which are submerged at high tide, from which it would appear that not only has the government in general terms conveyed to them this tide land in consideration, but in specific cases has patented to them a portion thereof.

"This view seems to be confirmed by a map of the reservation, prepared in 1856 by Governor Stevens, who made the treaty with the Puyallups, in which, while not conclusive in itself, the water line of the reservation is so drawn as to certainly seem to include a considerable portion of land that ordinarily would be overflowed by high tide. While this is not conclusive in itself, it certainly adds weght, in so far as it goes, to the conclusion which I have set forth.

"In differing in this particular with the views of the honorable Assistant Attorney General (see his memorandum), I beg leave to suggest that the setting apart by the government of this particular tract of land to these people was, from the nature of the case, as being intended to provide an isolated home for them, exceptional in its character, and takes it out of the operation of the common law as set forth by the commissioners."

The concluding paragraph of the above quotation challenges attention to the fallacy of the whole argument, for there it appears to be

based upon an assumption that by setting apart this reservation for their use the government intended to isolate the Puyallups, and for that reason a grant of the shore should be presumed contrary to the general laws of the country. If the supposed intention existed when the reservation was first created and was based upon conditions then existing, it was subject to change when the conditions changed by the advance of civilization, the education and enfranchisement of the Indians, and the utilization of Commencement Bay as the harbor of a commercial city. Of course, a mere change of conditions would not annul a valid grant of property rights, but the executive orders making a reservation of public land for use of the Indians were not irrevocable, nor in any sense a grant of title. The difference between a reservation and a grant is as wide as the difference between a tenancy at will and an estate of freehold, and every step in the process of transferring the title to land within this reservation, and the entire history of Indian reservations, is incompatible with any theory other than that the title remained vested in the government until the lands were allotted or sold. Ross v. Eells (C. C.) 56 Fed. 855; s. c., 64 Fed. 417, 12 C. C. A. 205; U. S. v. Moore, 161 Fed. 513, 88 C. C. A. 455.

I intend by my selection of words in the preceding paragraph to emphasize the fact that the object of this suit is to obtain a decree establishing an absolute title in fee simple to property of no value as fishing ground, but worth now several hundred thousand dollars for industrial uses, and having, in view of its environments and in connection with projected enterprises, a potential value of many millions of dollars; and to direct attention to the distinction between this case and the case of the United States v. Winans, 198 U. S. 371, 25 Sup. Ct. 662, 49 L. Ed. 1089, which was a suit to preserve rights of Indians to resort to a fishing station for the purpose of taking and curing fish, assured to them by a treaty.

(c) Can the title asserted by the Indian complainants be supported by any grant from, or declaration or act of, the state of Washington, or by estoppel? The decision of these questions involves only the consideration of the compact between the state of Washington and the United States government contained in article 26 of the state Constitution. In two unpublished decisions, this court has held that shore lands, and lands subject to tidal overflow at extreme high tide, are comprehended within the terms of the compact by which the state disclaims all right and title to all lands owned or held by any Indian or Indian tribes. In one of said cases the property in controversy was the rim of Squaxon Island, the whole of which was by a treaty reserved for an Indian reservation, and which at the time of the adoption of the Constitution remained a reservation and in the exclusive possession of the Indians, and the court held that, by actual possession of the Island, the Indians held all of its shore, and therefore vendees of the state were by the terms of the compact precluded from acquiring any right thereto until the rights of the Indians should be terminated by action of the government of the United States. In the memorandum decision, the Court said:

"This disclaimer applies not only to lands owned by the Indians, whether patented or unpatented, but also to all lands held, that is to say, occupied and used, by individual Indians, or by tribes." Manuscript Decision in Case of United States v. O'Brien et al. (No. 849, filed in U. S. Circuit Court at Tacoma).

The other case referred to involved the title to land covered with grass situated within the surveyed boundaries of the Swinomish Indian reservation, and above the line of ordinary high tide, although subject to overflow periodically by extreme high tides. The Swinomish reservation having been surveyed according to established rules, and the land in question being within the surveyed boundaries of an Indian reservation at the date of the adoption of the state Constitution, and being above the line of ordinary high tide, and having been allotted to an Indian, the title of the allottee was held to be superior to the claim of title asserted by a vendee of the state, and the decision was rested partly upon the compact contained in the state Constitution. Manuscript decision in case of Corrigan v. Brown (No. 1093, filed. in U. S. Circuit Court at Seattle).

These decisions were based upon grounds which do not exist in the present case, and they are not precedents supporting the contention of the complainants.

The compact cannot be construed in any way to make it effective as a grant or conveyance of title; it is but a declaration that the state will respect existing rights of Indians during such time as such rights continue to exist, and its utmost effect is to bar the state and its vendees from claiming land owned, or held in exclusive possession, by Indians or tribes at the date of the adoption of the Constitution.

So far from establishing a title to the tide lands in controversy by prescription, or adverse possession, the facts are that the Indian complainants have never held exclusive possession, nor have they been recognized as owners.; the state of Washington has, since its organization, continuously and steadfastly asserted its paramount title; and the national government through the Secretary of the Interior, the head of the department having superintendence of Indian affairs, denied the claim which they assert 15 years prior to the commencement of this litigation, during which time the Indian complainants have not been restrained by legal disabilities, but have been entitled to all the rights of citizenship, including the right to litigate in the courts of the country.

For the reasons above given, I direct that a decree be entered on the merits, that the complainants take nothing, that the titles of the respective defendants be quieted, and that they recover their taxable costs.