# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PHILIP EDWARD SIFFERMAN; BRUCE PENOSKE and RAELYN PENOSKE, husband and wife; STEVEN R. RAMELS and JACQUELINE J. RAMELS, husband and wife; MICHAEL F. LASS and DIANE E. LASS, husband and wife, THOMAS H. JANSEN and SHARON L. JANSEN, husband and wife, and PATRICK W. FRENCH; and PARADISE LAKE HOUSE LLC, | No. 54514-4-II |
| Appellants, | |
| v. | |
| CHELAN COUNTY and its TREASURER, DAVID GRIFFITHS; STATE OF WASHIGNTON, DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Respondents. | |

CRUSER, J. — This case involves the transfer of interests in vacation homes constructed on leased land held in trust by the United States government on behalf of a Native American family. Appellants Philip Sifferman, Bruce and Raelyn Penoske, Steven and Jacqueline Ramels, Michael and Diane Lass, Thomas and Sharon Jansen, Patrick French, and Paradise Lake House LLC (collectively taxpayers) paid a real estate excise tax (REET) when they assigned their interests in subleased lots and the vacation homes constructed thereon to new sublessees. None of the parties

involved in the transfer were members of the Native American family for whom the land was allotted. The taxpayers filed a suit challenging imposition of the REET on their transactions on various grounds, naming both the Department of Revenue and Chelan County (collectively DOR) as defendants.

The taxpayers appeal from the trial court's order dismissing their class action refund claims, dismissing their motion for summary judgment, and granting DOR's motion for summary judgment. They argue that (1) they are not obligated to meet the requirements in RCW 82.32.180 to obtain a refund of the tax they paid because their claims arise under the Uniform Declaratory Judgments Act (UDJA) ch. 7.24 RCW and RCW 82.32.150, (2) the amount of tax they paid was incorrect under state law, (3) federal law preempts imposition of the REET on transfers of subleases on Native American land, (4) imposition of the REET violated their rights to due process arising under the Washington and United States Constitutions, and (5) the trial court erred in dismissing their class action claims.

We hold that (1) the taxpayers were obligated to satisfy the requirements in RCW 82.32.180 because they seek refunds of taxes already paid, and RCW 82.32.150 and the UDJA do not apply to their claims, (2) under RCW 82.32.180, the taxpayers failed to meet their burden of demonstrating the correct amount of tax owed, (3) federal law does not preempt the REET as applied in this case, and (4) imposition of the REET does not violate the taxpayers' rights to due process. Based on the foregoing, (5) we need not determine whether the trial court erred in dismissing the taxpayers' class action claims.

Accordingly, we affirm.

FACTS

I. WAPATO POINT RESORT

Wapato Point, located on the shorelines of Lake Chelan in Chelan County, is a segment of land that was allotted to Peter Wapato or Que-til-qua-soon by the United States Government under the original Indian[1] trust allotment, Moses Agreement No. 10. The allotted land is held in trust by the United States on behalf of the Wapato family and is administered by the Bureau of Indian Affairs.

In 1976, members of the Wapato family entered into a lease agreement with Wapato Point Resources, Inc. The parties envisioned that Wapato Point Resources would operate a resort complex on the premises comprised of motels, condominiums, and leased lots. Third parties would then sublease the condominiums or unimproved lots from Wapato Point Resources. Wright-Wapato, Inc. has since assumed responsibility over Wapato Point Resources' role as lessee under the lease agreement with the Wapato family.

At present, the resort is comprised of ten separate entities called "associations," that include time-share condominium associations, full-share private residents associations, and full-share condominium associations. Clerk's Papers (CP) at 125. Unlike the time-share associations, wherein owners split a right to use a vacation property with other members, members of the full-share associations have exclusive rights to their subleased property.

---

[1] In this opinion, we use the terms "Indian," "Indian land," or "Indian country" when referring to the cases or statutes that also use that language. Elsewhere, we use the term "Native American," which is "more formal [and] less colloquial." *See In re Dependency of Z.J.G.*, 196 Wn.2d 152, 157 n.3, 471 P.3d 853 (2020).

While the Wapato Point resort complex construction was underway, Wapato Point Resources entered into an agreement with Chelan County wherein Wapato Point Resources agreed to make payments to the county "in lieu of taxes." *Id.* at 195. Wright-Wapato and its related entities continue to honor the agreement between Wapato Point Resources and Chelan County. The agreement was made in recognition of the fact that "under the applicable laws of the United States and of the State of Washington . . . the premises, the improvements constructed or to be constructed thereon, and the said lease are all exempt from real and personal property ad valorem taxes and from the state leasehold excise tax." *Id.* at 194.

Because the anticipated construction and operation of the resort complex would require the county to expend its resources and provide services to Wapato Point, the payments represented "a fair contribution to cover all local governmental services." *Id.* at 195. Chelan County provides services to Wapato Point that include fire services, law enforcement, water, electricity, courts, and schools. Beyond contracting with a company for trash removal, Wright-Wapato does not provide resort residents with any services analogous to government services. Funds for the voluntary payments to the county are raised from dues collected from the resort's sublessees.

In 1994, DOR addressed the complexities of assessing a REET on transfers of time-share properties at Wapato Point in a letter sent to an attorney regarding the Wapato Point Development Company. The letter stated that because the value of such improvements could not readily be determined, DOR concluded that for time-share condominium units at Wapato Point, the REET should be assessed based on 50 percent of the sales price. DOR provided instructions for completing a REET affidavit for such improvements based on 50 percent of the sales price.

II. TRANSFERS OF SUBLEASES AND IMPROVEMENTS ON WAPATO POINT

Taxpayers Sifferman, the Ramels, and the Penoskes entered into real estate transactions in which they assigned their respective subleases and the improvements constructed thereon to their successors in interest. On the REET affidavit forms, Sifferman, the Ramels, and the Penoskes each listed a "Taxable Selling Price" for their sublease and improvements that was equivalent to the "Gross Selling Price." *Id.* at 102-04, 107. The REET is calculated based on the taxable selling price listed on the REET affidavit. Therefore, Sifferman, the Ramels, and the Penoskes paid their respective REETs at a rate of 1.78 percent of the total gross selling price for their leasehold properties.

Taxpayers Michael and Diane Lass, Thomas and Sharon Jansen, and Patrick French (the Lass owners), and Paradise Lake House LLC also entered into real estate transactions in which they assigned their subleases and the improvements constructed thereon to their successors in interest. However, unlike Sifferman, the Ramels, and the Penoskes, the Lass owners and Paradise Lake House LLC listed the "Taxable Selling Price" for their respective leasehold interests at half of the "Gross Selling Price." *Id.* at 105-06. Consequently, the Lass owners and Paradise Lake House LLC paid REETs at a rate of 1.78 percent based on half the gross selling price for their leasehold properties and not the total gross selling price.

In addition to the REET, each taxpayer paid a fee of 3.5 percent of the transaction price of their sublease transfer or assignment as required under the master lease agreement to Wright-Wapato. The fee is based on gross receipts of the sale and is paid to the beneficiaries of the Wapato family members who signed the master lease agreement as lessors of the Wapato Point trust

allotment. Wright-Wapato collects the fee upon sale of a leasehold interest and remits the payment to the Wapato family beneficiaries.[2]

The improvements on the taxpayers' subleased properties were private residences rather than condominium units. Therefore, each taxpayer transferred or assigned a sublease to a full-share private residence as opposed to a time-share condominium unit.[3] The taxpayers are not members of the Wapato family, and none of the taxpayers identified themselves as members of a Native American tribe.

### III. PROCEDURAL HISTORY

The taxpayers filed suit naming Chelan County and the Washington Department of Revenue as defendants and alleging that the REET they paid on transfers of their sublease properties on Native American land was an unlawful and unconstitutional tax. The complaint

---

[2] Throughout their brief, the taxpayers refer to the 3.5 percent fee on the sale of their properties as a "tribal tax." *See e.g.*, Br. of Appellants at 13, 18. This characterization is misleading because the fee is paid to members of the Wapato family and is not a tax collected by a tribe to support government functions on tribal land.

[3] The parties dispute whether the taxpayers owned the improvements constructed on their leased lots. Evidence in the record supports both positions. For example, the master lease provides that any structures constructed on a leased premises "become the property of the Lessor," thus indicating that the improvements belong to the Wapato family and not to the sublessees. CP at 228. Conversely, the Vice President of Wright-Wapato testified during his deposition that individuals who own full-share private residences own their improvements. One of the owners of the Lass property also testified in a deposition that they owned the improvements constructed on their lot. This factual dispute is not material because a REET applies to "any conveyance, grant, assignment, quitclaim, or transfer of the ownership of or title to real property . . . or any estate or interest therein for a valuable consideration." RCW 82.45.010 (RCW 82.45.010 was amended in 2018 and 2019. These amendments have no impact on our analysis; therefore, we cite to the current version of the statute). Therefore, ownership of an improvement is not dispositive to determining whether the REET applies to the transactions at issue and is only relevant to the extent that it impacts the value of the transferred interest.

described the taxpayers' claims as arising under RCW 82.32.150[4] and the UDJA, ch. 7.24 RCW. In addition to seeking declaratory relief resolving whether the REET may be applied to transfers of subleases on Native American land, the taxpayers also requested that the trial court order the county and the State to refund the taxpayers for the alleged unlawfully assessed tax. The complaint further included a request that the trial court certify a class of similarly situated and unnamed taxpayers under CR 23(b).

DOR moved to dismiss the class action refund claims, arguing that a claim for a refund of a REET that has already been paid falls within the exclusive scope of RCW 82.32.180.[5] DOR asserted that, following the Supreme Court's decision in *Lacey Nursing Center, Inc. v. Department of Revenue*, 128 Wn.2d 40, 905 P.2d 338 (1995), a class action claim for an excise tax refund under RCW 82.32.180 cannot proceed.

The taxpayers responded that their causes of action arise under the UDJA and RCW 82.32.150 because they contest the validity of the tax imposed under the circumstances and did not merely seek a refund. The trial court agreed with DOR and, without considering certification of the putative class under CR 23(b), granted DOR's motion to strike the taxpayers' class action refund claims with prejudice.

Thereafter, both parties moved for summary judgment, agreeing that there were no disputes of material fact and that the issues before the court pertained solely to matters of law. DOR argued

---

[4] RCW 82.32.150 provides that before filing a claim challenging a tax in any court, the taxpayer must first pay the tax in full. This statute provides further that the court shall not enjoin collection of a tax unless the assessment of the tax violated either the Washington or the United States Constitutions. RCW 82.32.150.

[5] RCW 82.32.180 sets forth requirements and procedures for seeking a tax refund in an action before the superior court of Thurston County.

that the REET was properly imposed because the transaction met the statutory definition of a sale, federal law does not preempt imposition of the REET, and the taxpayers failed to satisfy their burden of demonstrating eligibility for a refund under RCW 82.32.180.

The taxpayers argued that they were entitled to summary judgment in their favor because the REET could only apply to the value of improvements on their lots rather than to the entire consideration paid for the sublease transfer, federal law preempts the REET, and imposition of the REET under the circumstances was unconstitutional. The taxpayers reasserted that their claims did not fall within RCW 82.32.180 and so they were not bound by that statute's procedural requirements. Instead, because they sought to invalidate the tax as applied under the circumstances, their claims were for declaratory relief and could proceed under RCW 82.32.150 and the UDJA.

The trial court granted DOR's motion for summary judgment, denied the taxpayers' motion for summary judgment, and dismissed the taxpayers' claims with prejudice. The taxpayers appeal the trial court's order dismissing their class action refund claims, and the trial court's order granting DOR's motion for summary judgment and denying their motion for summary judgment.

## STANDARD OF REVIEW

We review a trial court's decision to grant a motion for summary judgment de novo, and we perform the same inquiry as the trial court. *Wash. Imaging Servs., LLC v. Dep't of Revenue*, 171 Wn.2d 548, 555, 252 P.3d 885 (2011). Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c).

DISCUSSION

I. NATURE OF THE TAXPAYERS' CLAIMS

The taxpayers contend that although they requested a refund of the REET they paid on transfers of their subleases and improvements, their claims do not arise under RCW 82.32.180, which is the statute that sets forth the process for seeking a refund of an excise tax such as the REET. Rather, the taxpayers assert that refund actions contemplated under RCW 82.32.180 involve computational errors, claims of entitlement to an exemption, or similar issues. Because the taxpayers broadly challenge the lawfulness or validity of the REET as applied to them, and they seek declaratory relief in addition to a refund, they argue that their claims fall within the scope of the UDJA and RCW 82.32.150.

DOR responds that the taxpayers cannot raise their claims under the UDJA because the legislature set forth specific procedures for contesting the imposition of a tax under RCW 82.32.180 and limited the availability of equitable remedies in RCW 82.32.150. In addition, DOR contends that declaratory relief is inappropriate in circumstances where, as here, an adequate remedy has been specifically delineated by the legislature to resolve a claim. DOR argues further that the taxpayers cannot obtain a refund of the REET under RCW 82.32.150 because the unambiguous language of the statute only provides for injunctive relief. We agree with DOR that the taxpayers' claims are refund claims within the scope of RCW 82.32.180.

The right to sue the state and local governments was "created by statute and is not a fundamental right." *Medina v. Pub. Util. Dist. No. 1 of Benton County*, 147 Wn.2d 303, 312, 53 P.3d 993 (2002). Consequently, the State can impose limitations on that right. *Id.* Article II, section

26 of Washington's Constitution expressly recognizes that the legislature is entitled to "direct by law, in what manner, and in what courts, suits may be brought against the state."

State and local governments impose excise taxes on sales of real estate under RCW 82.45.060 and RCW 82.46.010(4). The administrative procedures set forth in ch. 82.32 RCW apply to excise taxes imposed on sales of real estate under these statutes. RCW 82.45.150; RCW 82.46.010(5). Therefore, RCW 82.32.180 and RCW 82.32.150 apply to the REET challenged here.

Because RCW 82.32.180 is a "conditional, partial waiver of the sovereign immunity afforded by Article II, § 26 of the Washington constitution," taxpayers who seek a refund of an excise tax must exercise their right to bring a suit against the State "'in the manner provided by the statute.'" *Lacey*, 128 Wn.2d at 52 (quoting *Guy F. Atkinson Co. v. State*, 66 Wn.2d 570, 575, 403 P.2d 880 (1965)). In addition, RCW 82.32.150 designates the sole circumstance in which a taxpayer can seek to prospectively enjoin imposition of a tax. *Booker Auction Co. v. Dep't of Revenue*, 158 Wn. App. 84, 88, 241 P.3d 439 (2010). Together, RCW 82.32.180 and RCW 82.32.150 "constitute the legislature's specific pronouncements with regard to tax disputes in superior court." *Id.* at 89-90.

A. RCW 82.32.180 APPLIES TO THE TAXPAYERS' CLAIMS

RCW 82.32.180 establishes specific conditions that taxpayers are required to satisfy when seeking a refund of an excise tax. *Lacey*, 128 Wn.2d at 50. In addition to the requirement that a taxpayer keep certain records, taxpayers must also "(1) identify themselves, (2) state the correct amount of tax each concedes to be the true amount, (3) state reasons why the tax should be reduced or abated, and then (4) prove that the tax paid by the taxpayer is incorrect." *Id.* (summarizing the requirements in RCW 82.32.180). As provided in RCW 82.32.180, "no court action or proceeding

of any kind shall be maintained by the taxpayer to recover any tax paid, or any part thereof, except as herein provided."

The taxpayers contend that RCW 82.32.180 does not apply to their claims because they challenge the validity of the tax as applied to them and do not merely seek a refund of the excess tax paid. We disagree.

After considering identical reasoning regarding an alleged distinction between a substantive challenge to the lawfulness of an excise tax and a challenge based on a computational or factual error, the supreme court held that refund claims in both circumstances must adhere to the requirements in RCW 82.32.180. *Lacey*, 128 Wn.2d at 52-53. There, the trial court reasoned that RCW 82.32.180 impliedly exempts from its requirements claims based on the legal basis of the tax because the conditions imposed in RCW 82.32.180 apply only to individual claims that allege factual errors pertaining to that particular tax assessment. *Id.*

The supreme court disagreed with the trial court's reasoning in *Lacey*, holding that "[t]he language of RCW 82.32.180 demonstrates that the Legislature intended excise tax refunds to be made only as prescribed by the statute," and "excise tax refunds may properly be appealed by a taxpayer only if the taxpayer satisfies the conditions specified under the statute." *Id.* at 53. Therefore, where a taxpayer seeks a refund of a tax already paid, the procedural requirements remain the same regardless of the reasoning presented in support of the refund claim. *See id.* at 52-53.

The taxpayers argue that their refund claim does not fit within the scope of RCW 82.32.180 because WAC 458-61A-301(12) limits refunds under RCW 82.32.180 to claims that meet specific circumstances, none of which apply to the taxpayers' claim that the tax is invalid as applied to

11

them. The taxpayers are mistaken because WAC 458-61A-301(12) designates the procedures for seeking a refund directly from the county or from DOR. *See* WAC 458-61A-301(12)(c) (describing the process for submitting a tax refund request form to either the county or DOR). This regulation does not address or otherwise limit the types of claims that a taxpayer may raise when seeking a refund in an action filed in superior court under RCW 82.32.180.

Finally, the taxpayers argue that RCW 82.32.180 is only applicable to actions seeking refunds against the State, but they also seek a refund from the county. Local REETs, however, "must comply with all applicable rules, regulations, laws, and court decisions regarding real estate excise taxes as imposed by the state." RCW 82.46.010(5). Because the general administrative procedures set forth in ch. 82.32 RCW apply to REETs imposed by the State, the same is true of a REET imposed by local governments. *See* RCW 82.45.150; RCW 82.46.010(5).

In filing their complaint, the taxpayers requested relief in the form a refund of the REET paid on the transfers of their subleases and improvements. On appeal, the taxpayers assign error to the trial court's dismissal of their request for a refund following its decision on summary judgment. Therefore, the taxpayers' claims for a refund fall within the scope of RCW 82.32.180 regardless of the manner in which they argue their entitlement to a refund, or against whom the claim is brought. *See Lacey*, 128 Wn.2d at 53.

B. RCW 82.32.150 DOES NOT INDEPENDENTLY AUTHORIZE THE TAXPAYERS' REFUND CLAIMS

The taxpayers argue that their claim for declaratory relief falls within RCW 82.32.150 and, relying on *Kirkland v. Department of Revenue*, 45 Wn. App. 720, 727 P.2d 254 (1986), that RCW 83.32.150 independently allows taxpayers to file suit requesting refunds. We disagree.

By its plain language, RCW 82.32.150 does not pertain to refunds. This statute provides in full:

> All taxes, penalties, and interest shall be paid in full before any action may be instituted in any court to contest all or any part of such taxes, penalties, or interest. No restraining order or injunction shall be granted or issued by any court or judge to restrain or enjoin the collection of any tax or penalty or any part thereof, except upon the ground that the assessment thereof was in violation of the Constitution of the United States or that of the state.

RCW 82.32.150.

We have previously construed RCW 82.32.150 to generally require taxpayers to first pay the full amount of assessed taxes before addressing the issue to the court unless the challenge to the assessed tax is based on constitutional grounds. *AOL, LLC v. Dep't of Revenue*, 149 Wn. App. 533, 546-47, 205 P.3d 159 (2009). If the challenge to a tax is based on constitutional grounds, "[t]hen, and only then, does the legislature allow a taxpayer access to the courts without first paying the full assessed taxes." *Id.* at 547. But where the taxpayers have already voluntarily paid a tax, "[t]here is no reason for a court to enjoin the Department's collection of [the] tax." *Id.*

The taxpayers here have paid the REET on their sublease transfers and their claims would not be remedied by injunctive relief. Although the taxpayers raise a constitutional challenge to the REET, the proviso in RCW 82.32.150 regarding injunctive relief for constitutional claims plainly does not apply here.

Taxpayers rely on *Kirkland* to argue that RCW 82.32.150 allows a taxpayer to seek a refund independent of the procedural requirements in RCW 82.32.180. However, *Kirkland* does not support the taxpayers' proposition. There, the court addressed whether the taxpayer was permitted to access an administrative remedy to resolve his claim where he had already paid a portion of the tax owed. 45 Wn. App. at 723. The court held that because the taxpayer had already made a

13

payment before pursuing an administrative remedy, "Kirkland's only remedy is to challenge the assessment in a refund action under RCW 82.32.150." *Id.*

Given the narrow issue before the court in *Kirkland*, its holding was limited to the fact that RCW 82.32.150 precludes an administrative remedy when a payment has already been made. *Id.* The court neither ruled on whether RCW 82.32.150 independently authorized a refund claim nor on whether an individual who ultimately seeks a refund based on a constitutional argument can proceed under RCW 82.32.150 rather than RCW 82.32.180. *See id.* Moreover, RCW 82.32.180 unambiguously states that refund actions filed in state court must satisfy the requirements outlined therein. To interpret RCW 82.32.150 as separately authorizing refund actions would create a conflict with RCW 82.32.180.

Because the taxpayers have already paid the REET assessed on their sublease transfers, and because RCW 82.32.150 does not independently authorize taxpayers to file a claim for an excise tax refund, RCW 82.32.150 does not apply to the taxpayers' claims.

C. THE UDJA DOES NOT APPLY TO THE TAXPAYERS' CLAIMS

As noted above, in RCW 82.32.180, the legislature specified the procedural requirements to which a taxpayer must adhere in an excise tax refund action filed in state court. *Lacey*, 128 Wn.2d at 52. In addition, in RCW 82.32.150, the legislature "provide[d] a legal remedy and limit[ed] the court's equitable powers," allowing a court to issue an injunction only in constitutional cases. *Tyler Pipe Indus., Inc. v. Dep't of Revenue*, 96 Wn.2d 785, 791, 638 P.2d 1213 (1982).

Despite these legislative pronouncements, the taxpayers argue that they may raise their claims under the UDJA because their claims turn on the validity of the tax as applied to them, and

thus they are entitled to judicial determination of their rights, status, and legal relations. We disagree.

Allowing the taxpayers to proceed with a claim for a refund under the auspices of a declaratory relief action under the UDJA, while excusing the taxpayers from the explicit requirements for refund actions in RCW 82.32.180, would create a conflict between the statutes. A similar problem would arise if taxpayers could seek to restrain further imposition of the REET under the UDJA without satisfying the requirements for injunctive relief under RCW 82.32.150. Under the principles of statutory construction, if a general statute and specific statute concern the same subject matter and cannot be harmonized, the specific statute prevails. *Booker*, 158 Wn. App. at 90.

Both RCW 82.32.150 and RCW 82.32.180 specifically concern disputes regarding assessment of the REET at issue here and are the more specific statutes. Therefore, RCW 82.32.180 and RCW 82.32.150 control over the UDJA in this instance. *See id.* at 89-90 (holding that a taxpayer cannot proceed with a nonconstitutional challenge to imposition of a tax before payment of that tax under the Administrative Procedures Act because the procedures in ch. 82.32 RCW are more specific enactments, and the taxpayer was bound to adhere to them).

Moreover, under ordinary circumstances, if a plaintiff has another adequate remedy available, the plaintiff "should not proceed by way of a declaratory judgment action; but declaratory relief may be 'appropriate' in some situations, notwithstanding the availability of another remedy." *Wagers v. Goodwin*, 92 Wn. App. 876, 880, 964 P.2d 1214 (1998) (quoting *City of Federal Way v. King County*, 62 Wn. App. 530, 535 n.3, 815 P.2d 790 (1991)); *see also* CR 57 (providing that "[t]he existence of another adequate remedy does not preclude a judgment for

declaratory relief in cases *where it is appropriate*" (emphasis added)). Here, declaratory relief for the taxpayers' claims would not constitute an appropriate remedy to the extent that it obviates the requirements imposed by the legislature in RCW 82.32.150 and RCW 82.32.180.

In addition, the UDJA is not an appropriate remedy for the taxpayers' claims because the taxpayers do not challenge the facial validity of the REET. "Declaratory judgments are proper 'to determine the facial validity of an enactment, as distinguished from its application or administration.'" *Hood Canal Sand & Gravel, LLC v. Goldmark*, 195 Wn. App. 284, 305, 381 P.3d 95 (2016) (internal quotation marks omitted) (quoting *Bainbridge Citizens United v. Dep't of Nat. Res.*, 147 Wn. App. 365, 374, 198 P.3d 1033 (2008)). The taxpayers do not ask that we declare that imposition of a REET on transfers of improvements on leased land is an invalid tax that can never be properly imposed. Instead, they ask for a refund of the taxes paid and ask that we determine that the REET should not apply to transfers of subleases on Native American land. Therefore, declaratory judgment based solely on the application of the REET under the circumstances would be improper. *See id.*[6]

To support their argument that courts may entertain a challenge to the validity of a tax under the UDJA, the taxpayers list several cases that involved a request for declaratory relief based on a claim that a tax was invalid. Each case is distinguishable. Most cases that the taxpayers rely on do not involve excise taxes and thus do not implicate the procedures in ch. 82.32 RCW. *See New Cingular PCS, LLC v. City of Clyde Hill*, 185 Wn.2d 594, 374 P.3d 151 (2016) (challenging imposition of a municipal fine imposed after a taxpayer made false claims on utility tax returns);

---

[6] The arguments raised in the taxpayers' due process claim, addressed below, could arguably be construed as a facial challenge to the validity of the REET. Nevertheless, the taxpayers do not ask that we invalidate the REET in its entirety on this basis.

*Lane v. City of Seattle*, 164 Wn.2d 875, 194 P.3d 977 (2008) (challenging the City of Seattle's imposition of a tax on fire hydrants on Seattle Public Utilities that Seattle Public Utilities then collected by raising rates on water ratepayers); *Boeing Aircraft Co. v. Reconstruction Fin. Corp.*, 25 Wn.2d 652, 171 P.2d 838 (1946) (involving property taxes); *Texas Co. v. Cohn*, 8 Wn.2d 360, 112 P.2d 522 (1941) (challenging imposition of fuel oil taxes); *Carrillo v. City of Ocean Shores*, 122 Wn. App. 592, 94 P.3d 961 (2004) (challenging imposition of water and sewer charge as an unconstitutional property tax).

The taxpayers also rely on *Covell v. City of Seattle*, 127 Wn.2d 874, 905 P.2d 324 (1995) *abrogated on other grounds by Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019). That case is distinguishable because it involved a challenge to the facial validity of a street utility tax that the city incorrectly argued could be characterized as a regulatory fee or as an excise tax. *Covell*, 127 Wn.2d at 876-78, 891. Finally, the taxpayers cite *Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 157 P.3d 847 (2007). The issue before the court in *Nelson* was whether a car dealership could relay the cost of its business and occupation tax on consumers and did not involve the validity of the underlying tax in any respect. 160 Wn.2d at 179. As this recapitulation demonstrates, the cases the taxpayers rely on are inapposite and do not support their assertion that they may challenge the validity of the REET under the UDJA in lieu of the procedures set forth by the legislature in ch. 82.32 RCW.

D. SUMMARY

The taxpayers' claims fall solely within the scope of RCW 82.32.180 because they seek a refund of taxes already paid and declaratory relief under the UDJA would be an inappropriate remedy under the circumstances. Accordingly, the taxpayers have the burden of proving that the amount of tax they paid was incorrect, and they have the burden of proving the correct amount of the tax owed. *See Bravern Residential, II, LLC v Dep't of Revenue*, 183 Wn. App. 769, 776, 334 P.3d 1182 (2014) (citing RCW 82.32.180).

II. ENTITLEMENT TO A REFUND UNDER WASHINGTON LAW

The taxpayers acknowledge that a REET may be imposed on the value of improvements transferred on leased land, but they contend that because the values of the taxpayers' improvements are not entered on the county assessor's rolls, a REET cannot be imposed on their transactions. Relying on a letter from DOR regarding other properties on Wapato Point, the taxpayers argue that at minimum, Sifferman, the Ramels, and the Penoskes are entitled to a 50 percent refund because their REET payments were improperly based on 100 percent of the gross selling price of their transfers.

DOR responds that the taxpayers did not meet their burden under RCW 82.32.180 of establishing the correct amount of tax that they owed, and summary judgment dismissal of their refund claims was proper. DOR asserts that the fact that the value of the taxpayers' improvements was not listed on county assessor's rolls does not exempt the taxpayers from their REET obligation. Moreover, to the extent that DOR's letter provides any authority in resolving this issue, DOR argues that the instructions in the letter are limited to time-share units and do not apply to the full-share residences at issue here. We agree with DOR that the taxpayers have not satisfied their

burden of proving the correct amount of tax that they owe under RCW 82.32.180 to qualify for a refund.

A REET is assessed for each sale of real property, and the burden of paying the REET falls on the seller. RCW 82.45.060(1); RCW 82.45.080(1). A "sale" of real property is defined as,

> any conveyance, grant, assignment, quitclaim, or transfer of the ownership of or title to real property, including standing timber, or any estate or interest therein for a valuable consideration, and any contract for such conveyance, grant, assignment, quitclaim, or transfer, and any lease with an option to purchase real property . . . The term also includes the grant, assignment, quitclaim, sale, or transfer of improvements constructed upon leased land.

RCW 82.45.010(1). Transfers of leasehold interests other than those defined as a "sale" in RCW 82.45.010(1) are not subject to a REET. RCW 82.45.010(3)(c). Accordingly, the parties agree that the REET applies to the value of the transfers of improvements on the taxpayers' subleased properties. The transfer of the interest in the subleased land, however, is not taxable under this framework. *See* RCW 82.45.010(3)(c).

Where a lessee transfers a leasehold interest in exchange for "valuable consideration," that transaction is taxable "to the extent the transfer includes any improvement constructed on leased land." WAC 458-61A-106(1)(b). "If the selling price of an improvement is not separately stated, or cannot otherwise be reasonably determined, the assessed value of the improvement as entered on the assessment rolls of the county assessor will be used." *Id.*

Relying on WAC 458-61A-106(1)(b), the taxpayers contend that without specific instructions in the REET affidavit, statutes, or regulations, and without guidance from the county assessor's rolls, they should not bear the responsibility of determining the values of their improvements. The taxpayers assert that ambiguities in the tax statutes should be construed in their favor and that therefore, no REET should be imposed. The taxpayers' argument is without merit.

There is no indication in the plain language of WAC 458-61A-106(1)(b) that taxpayers are exempt from the REET if the value of an improvement is not listed on the county assessor's rolls. Instead, the regulation provides that the county assessor's rolls may be used to determine the value of an improvement when other methods are impracticable. *Id.*

Moreover, the taxpayers have not shown that the values of their improvements cannot be reasonably determined through an appraisal or by any other means. The taxpayers argue that because there is no requirement in the REET statutes, regulations, or affidavit form compelling taxpayers to obtain an appraisal of an improvement, an appraisal is not a reasonable method for determining the value. But the fact that an appraisal is not explicitly required does not render an appraisal an unreasonable method for determining the value of an improvement.

The taxpayers' reliance on a DOR letter, which stated that the taxable value of a time-share improvement on leased land should be set at 50 percent of the sale price, is unavailing. DOR's letter specified that because the improvements at issue were time-share properties rather than exclusive-use properties, determining their value was particularly complicated. DOR believed that assessing the value at 50 percent of the sales price was thus an appropriate resolution in that instance. Here, however, the taxpayers transferred improvements that were private residences as opposed to time-share condominiums. Accordingly, DOR's conclusion in the letter provides little guidance to the circumstances in this case.

In a refund claim under RCW 82.32.180, taxpayers have an affirmative burden of establishing the correct amount of tax owed. *Bravern*, 183 Wn. App. at 776. Here, the taxpayers did not present any evidence demonstrating the correct values of the interest transferred in their individual improvements or that such a value would be impossible to determine. The fact that the

statutes, regulations, and REET affidavit do not specify the method for calculating the value of taxpayers' particular improvements does not entitle the taxpayers to a refund under RCW 82.32.180. And in so arguing, the taxpayers improperly displace their burden of establishing the correct amount of tax owed when seeking a refund. *See id.* Therefore, the trial court properly dismissed the taxpayers' state-law-based claims for a refund on summary judgment.

## III. FEDERAL PREEMPTION

Indian tribes have a "sovereign status" that renders them immune from state and local regulatory authority in many respects. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332, 103 S. Ct. 2378, 76 L. Ed. 2d 611 (1983). However, taxes imposed on non-Indians engaged in a taxable activity on Indian land, as here, have been upheld unless the tax was expressly or implicitly preempted by federal law. *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 173, 109 S. Ct. 1698, 104 L. Ed. 2d 209 (1989).

The taxpayers assert that Chelan County lacked authority to impose the REET on their sublease transfers of improvements on Indian land because federal law preempts imposition of the tax. The taxpayers argue that the REET at issue was expressly preempted under 25 U.S.C. § 5108.[7] The taxpayers contend further that although the issue is conclusively resolved under express preemption and we need not consider implicit preemption, the tax is also implicitly preempted under the balancing test announced in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980) (*Bracker*).

DOR argues that § 5108 is inapplicable and that the REET is not expressly preempted by federal law. DOR contends that even if § 5108 broadly applies, the REET is not expressly

---

[7] 25 U.S.C. § 5108 was formerly codified at 25 U.S.C § 465.

preempted because the tax is allowed under that statute. With regard to implicit preemption, DOR argues that the *Bracker* balancing test should not be invoked in transactions involving non-Indian individuals on non-reservation lands. However, even if the *Bracker* balancing test can be considered under the circumstances, DOR asserts that the REET is not implicitly preempted.

We agree with DOR that § 5108 does not apply to this case and that the REET is thus not explicitly preempted under federal law. We must therefore consider whether the REET is implicitly preempted. Contrary to DOR's assertion, the balancing analysis in *Bracker* applies to the allotted trust land involved in this case even if that land is not technically considered a reservation. On weighing the relevant interests under *Bracker*, the REET imposed on the real estate transactions involved in this case is not implicitly preempted.

A. EXPRESS PREEMPTION

The statute the taxpayers rely on in support of their federal preemption claim, § 5108, is a provision of the Indian Reorganization Act of 1934 (IRA). The statute provides in relevant part:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.
>
> . . . .
>
> Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 5108 (footnote omitted). The parties do not dispute that the allotted lands on which Wapato Point is located were not acquired pursuant to the IRA or pursuant to the Act of July 28,

22

1955. *See United States v. Moore*, 161 F. 513, 516-18 (9th Cir. 1908) (discussing a congressional act in 1884 allotting lands under the Moses Agreement). Rather the land at issue was allotted to the Wapato family as part of the Moses Agreement in 1884. *Id.*

DOR contends that because the allotment on which Wapato Point is situated was not acquired pursuant to the IRA or to the Act of July 28, 1955, by its plain language, § 5108 does not apply. The taxpayers counter that because the IRA established a right to lease allotted land held in trust by the United States government in 25 U.S.C. § 415, and that provision refers to the Moses allotments on which Wapato Point is located, the right at issue here was acquired pursuant to the IRA and § 5108 applies. We agree with DOR.

At issue is whether the right to lease allotted lands under § 415 is a "right[ ] acquired pursuant to this Act," within the meaning of § 5108. In § 415, Congress authorized Indian owners of restricted Indian lands to lease their lands subject to the approval of the Secretary of the Interior. The Moses Allotments are explicitly referenced within the list of restricted lands that may be leased for a term not to exceed 99 years. § 415(a).

Federal statutes are interpreted by "'ascertaining the intent of Congress and by giving effect to its legislative will,'" and "'[w]here the intent of Congress is evidenced clearly in the language of the statute, our inquiry ends there.'" *United States v. Sagg*, 125 F.3d 1294, 1295 (9th Cir. 1997) (quoting *United States v. Koyomejian*, 946 F.2d 1450, 1453 (9th Cir. 1991) (citations omitted)). The United States Supreme Court has specified that "'statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit.'" *Chickasaw Nation v. United States*, 534 U.S. 84, 93-94, 122 S. Ct. 528, 151 L. Ed. 2d 474 (2001) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S. Ct. 2399, 85 L. Ed. 2d 753 (1985)). However,

23

"the canon that assumes Congress intends its statutes to benefit the tribes is offset by the canon that warns us against interpreting federal statutes as providing tax exemptions unless those exemptions are clearly expressed." *Id.* at 95.

It is significant here that while § 5108 discusses the Secretary of the Interior's authority to acquire "interest in lands, water rights, or surface rights to lands" on behalf of Native American tribes, § 5108 makes no mention of a right to lease allotted lands, although such leases are also administered by the Secretary. § 415. Under the interpretive canon of *expressio unius est exclusio alterius*, there arises a negative implication that "'when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.'" *Copeland v. Ryan*, 852 F.3d 900, 907 (9th Cir. 2017) (quoting *Boudette v. Barnette*, 923 F.2d 754, 757 (9th Cir. 1991)). Therefore, in listing water rights, surface rights, and interests in land in § 5108, and subsequently stating that "title to lands or rights acquired under the Act" are exempt from federal and state taxation, Congress indicated that the exemption applied to the rights and interests listed in § 5108 and not to additional, undefined rights. *See id.* at 907.

Notably, Congress did not describe the authorization to lease previously allotted lands as a right within § 415. Nor is there any indication within the text of § 415 that such leases are exempt from federal or state taxation. Because the statute is unambiguous and because tax exemptions must be clearly expressed, we conclude that § 5108 does not apply to the allotted lands in this case.

Courts in other jurisdictions have similarly held that the tax exemption in § 5108 does not apply to trust land that was not acquired pursuant to the IRA or pursuant to the Act of July 28, 1955. For example, in *Herpel v. County of Riverside*, 45 Cal. App. 5th 96, 118-22, 258 Cal. Rptr. 3d 444 (2020), the court held that § 5108 did not expressly preempt a tax on possessory interests

of leased land that was allotted to tribe members prior to the IRA. Similarly, in *Pickerel Lake Outlet Ass'n v. Day County*, 2020 SD 72, ¶ 14-19, 953 N.W.2d 82, 89-91, the Supreme Court of South Dakota held that § 5108 was inapplicable where the taxpayers did not explain how the trust land acquired its status because the court could not determine whether the rights were acquired under the IRA.

Because the allotted land was acquired prior to enactment of the IRA, § 5108 does not apply to this case. The taxpayers have not identified an additional statute that preempts the tax at issue.[8] Therefore, the REET imposed on the transactions involved in this case is not expressly preempted by federal law.[9]

---

[8] The taxpayers argue that 25 C.F.R. § 162.017 independently establishes that federal law preempts the REET imposed in this case. This regulation states that leasehold interests, improvements on leased land, and activities conducted on leased land, are not subject to state or local taxation. However, courts have repeatedly held that that 25 C.F.R. § 162.017 "does not displace or modify *Bracker*—or otherwise change existing law—and therefore it does not of its own force operate to preempt any specific state tax." *Desert Water Agency v. U.S. Dep't of the Interior*, 849 F.3d 1250, 1256 (9th Cir. 2017); *see also Seminole Tribe of Fla. v. Stranburg*, 799 F.3d 1324, 1338 (11th Cir. 2015) (discussing 25 C.F.R. § 162.017 and holding that "deference to an agency's ultimate conclusion of federal preemption is inappropriate"). Instead, the regulation is more properly viewed as evidence of federal interests in a particular tax in the context of *Bracker* balancing. *Desert Water Agency*, 849 F.3d at 1256. We therefore consider the effect of this regulation on the issue before us within the scope of the *Bracker* balancing test rather than as an independent source of express federal preemption.

[9] To the extent that the taxpayers rely on *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 112 S. Ct. 683, 116 L. Ed. 2d 687 (1992), as conclusively establishing that the county cannot impose the REET on sales of Native American land, they are incorrect. *County of Yakima* is readily distinguishable. The land at issue in that case was allotted under the General Allotments Act. 502 U.S. at 269. The taxpayers have not shown that the same is true of the land at issue here. In addition, the REET in *County of Yakima* was imposed directly on tribal members. *Id.* This fact led the Supreme Court to construe the ambiguity regarding taxation of Native American land in the General Allotment Act to the tribe's benefit. *Id.* Here, the REET was not imposed on tribal members, nor on members of the Wapato family to whom the land was allotted.

B. IMPLICIT PREEMPTION

Even if a state tax is not expressly preempted by a federal statute, "the tax might still unlawfully infringe on tribal sovereignty or the objectives of federal legislation." *Everi Payments, Inc. v. Dep't of Revenue*, 6 Wn. App. 2d 580, 600, 432 P.3d 411 (2018). Such a tax would still be implicitly preempted by federal law and deemed invalid. *Id.* A state tax is implicitly preempted if imposition of the tax does not satisfy the *Bracker* balancing test. *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 102, 126 S. Ct. 676, 163 L. Ed. 2d 429 (2005).

1. The *Bracker* Balancing Test Applies

The taxpayers contend that a *Bracker* balancing test is unnecessary because federal law expressly preempts the REET in this case. The taxpayers are incorrect because, as discussed in the preceding section, federal law does not expressly preempt the REET.

DOR asserts that because the allotted lands involved in this case belong to the Wapato family, and the REET is not imposed on transactions that take place on reservations, the *Bracker* balancing does not apply. DOR relies on *Wagnon*, in which the Supreme Court stated that "[t]he Bracker interest-balancing test has never been applied where, as here, the State asserts its taxing authority over non-Indians off the reservation." *Id.* at 110.

We disagree with DOR that the *Wagnon* court imposed so narrow a definition of "reservation" for *Bracker* interest balancing purposes as to exclude allotted lands such as those involved here. In *Wagnon*, the Court explained that the balancing the test was limited to "*on-reservation* transactions" because the test was designed to protect tribal sovereignty from the imposition of state law within its borders. *Id.* at 112. But a state was not limited in asserting its taxing authority over Indian individuals who reside "outside of Indian country." *Id.* at 113.

The term "Indian country" is broader than suggested by DOR, and "the test for determining whether land is Indian country does not turn upon whether that land is denominated 'trust land' or 'reservation.'" *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 511, 111 S. Ct. 905, 112 L. Ed. 2d 1112 (1991). In outlining the geographic scope of sovereign immunity, the dispositive consideration is "whether the area has been 'validly set apart for the use of the Indians as such, under the superintendence of the Government.'" *Id.* (internal quotation marks omitted) (quoting *United States v. John*, 437 U.S. 634, 649, 98 S. Ct. 2541, 57 L. Ed. 2d 489 (1978)).

Here, the allotted lands are held in trust by the United States government for the benefit of the Wapato family. In addition, the allotted lands are exempt from property taxes and leasehold taxes. Even if the allotted lands are not expressly designated as a reservation, they remain subject to the administrative authority of the Bureau of Indian Affairs. In keeping with the purpose of *Bracker*, an interest balancing examination that protects the sovereignty of Indian individuals should be applied in this instance. *See Wagnon*, 546 U.S. at 112-13.

*2. Bracker* Does Not Preempt the REET

In *Bracker*, the Supreme Court established a framework to guide courts in determining whether a state may "assert[ ] authority over the conduct of non-Indians engaging in activity on the reservation." 448 U.S. at 144. Under the *Bracker* balancing test, courts conduct "a particularized inquiry," weighing "the nature of the state, federal, and tribal interests at stake," to determine "whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 145.

27

The taxpayers urge us to determine that the REET is preempted by federal law under *Bracker* because, they contend, the federal interests are strong while the state interests are minimal. The taxpayers identify 25 U.S.C. § 415, the statute governing leasing of allotted lands as authorized by the Secretary of the Interior, and the federal regulatory scheme propounded by the Bureau of Indian Affairs, including 25 C.F.R. § 162.017, as evincing a substantial federal interest in regulating taxation of leasehold interests on Indian land. The taxpayers do not argue that tribal interests are in any way implicated by the transactions at issue. Further, because dues are collected from Wapato Point sublessees that are then paid in lieu of taxes to the county, the taxpayers contend that the state interest in assessing the tax is minimal and does not outweigh federal or tribal interests.

DOR responds that the federal and tribal interests in this case are minimal, but that the State, in turn, has a significant interest in imposing the tax because it provides services to Wapato Point residents. We agree with DOR that because the transactions at issue do not involve Native American individuals and do not pose a significant impact on federal interests, the state interest in collecting the tax weighs in favor of upholding the REET.

*a. Federal Interests*

To determine the degree of federal interests involved, "we examine relevant federal law in terms of the underlying policies as well as historical notions of tribal independence and sovereignty." *Everi*, 6 Wn. App. 2d at 601. The federal statute governing leasing on allotted tribal lands, including the lands allotted pursuant to the Moses Agreement, does not express a position regarding taxation. *See* 25 U.S.C. § 415. As noted above, § 415 of the IRA removes restrictions on leasing allotted lands but is silent as to whether such activities are exempt from taxation.

The taxpayers are correct, however, in that the Bureau of Indian Affairs has set forth extensive regulations governing leasing on Native American land, and that these regulations generally preclude the imposition of any tax on transfers of leased interests. 25 C.F.R. §§ 162.001-.703. Of particular relevance, 25 C.F.R. § 162.017(a) provides, "Subject only to applicable Federal law, permanent improvements on the leased land, without regard to ownership of those improvements, are not subject to any fee, tax, assessment, levy, or other charge imposed by any State or political subdivision of a State."

Although this regulatory scheme presents evidence of a federal interest in governing leasing on Indian land, the regulations do not establish a substantial federal interest, sufficient in its own right, to preempt imposition of the REET. An agency regulation may preempt conflicting state law where that federal regulation was enacted with the force of law. *Wyeth v. Levine*, 555 U.S. 555, 576, 129 S. Ct. 1187, 173 L. Ed. 2d 51 (2009). But there is no indication in § 415 that Congress authorized the Bureau of Indian Affairs to wholly exempt leasing activities on Indian land from state taxation.

Moreover, federal interests in the *Bracker* context are associated with notions of tribal sovereignty. *Everi*, 6 Wn. App. 2d at 600. Although issues pertaining to leasing might impact tribal sovereignty in some contexts, such as when a tribe or member of a tribe is a party to a lease agreement, they do not do so here, where the transactions do not involve any Native American individuals or tribal members. Nor have the taxpayers identified any evidence that the REET interferes with federal interests in enabling leasing of lands allotted to tribes or Indian families under § 415. Without more particularized evidence of the federal interests impacted by the

29

transactions involved this case, the broad-sweeping regulations addressing leasing in 25 C.F.R. §§ 162.001-.703 do not supplant the state interest in collecting the tax.

*b. Tribal Interests*

The taxpayers do not identify any tribal interests that are impacted by the imposition of the REET on the transactions involved in this case. The fact that the burden of paying the tax does not fall on members of the Wapato family or on any other Native American individuals, however, is worth noting.

Aside from *Bracker*, the Supreme Court has weighed the relevant interests in determining whether a state tax is implicitly preempted by federal law on two other occasions. *See Cotton Petroleum Corp.*, 490 U.S. at 164; *Ramah Navajo Sch. Bd, Inc. v. Bureau of Revenue of NM*, 458 U.S. 832, 845 102 S. Ct. 3394, 73 L. Ed. 2d 1174 (1982). Unlike in *Bracker* or in *Ramah*, the Supreme Court upheld the state tax in *Cotton Petroleum*. 490 U.S. at 186-87. A critical point of distinction between *Cotton Petroleum* and *Bracker* and *Ramah* was the fact that in *Cotton Petroleum*, as here, the economic burden of the state tax did not fall on the tribe in any respect. *Id.* at 185.

Accordingly, the REET does not impede tribal sovereignty, and it does not have a demonstrated effect on tribal economic interests.

*c. State Interests*

The fact that the tax is imposed "on activities between non-Indians" reduces the State's burden in demonstrating its interest in assessing the tax and "[t]he State need not point to a specific interest." *Everi*, 6 Wn. App. 2d at 602. In addition, the State has a legitimate interest in raising revenue and its "interests are 'strongest when non-Indians are taxed, and those taxes are used to

provide [those non-Indians] with government services.'" *Id.* at 604 (alteration in original) (quoting *Salt River Pima-Maricopa Indian Cmty. v. Arizona*, 50 F.3d 734, 737 (9th Cir. 1995)).

On weighing the State's interest in *Cotton Petroleum*, the Court distinguished *Bracker* and *Ramah*, noting that "both cases involved complete abdication or noninvolvement of the State in the on-reservation activity." 490 U.S. at 185. In *Cotton Petroleum*, however, both the company contesting the tax and the tribe received substantial state services. *Id.* The Court thus held that the state tax was not preempted, explaining that "[t]his is not a case in which the State has had nothing to do with the on-reservation activity, save tax it." *Id.* at 186.

Similarly, here, Chelan County provides services to residents of Wapato Point including fire services, law enforcement, public utilities, courts, and schools. Although dues are collected from residents to pay for government services in lieu of taxes pursuant to an agreement with the county, the agreement states that the contributions are in place of leasehold and ad valorem property taxes. The agreement does not purport to replace the REET that the county would have otherwise collected from sales on property if it were not located on allotted land held in trust for the Wapato family. In addition, the 3.5 percent transactional fee imposed on the transfer of the subleases collected by Wright-Wapato is remitted to beneficiaries of the Wapato family and does not go to the provision of government services on Wapato Point. The state interests involved are thus substantial.

On balance, the interests weigh in favor of allowing the county to assess a REET on transfers of improvements on subleased property located on Native American land. Under *Bracker*, the REET here is not implicitly preempted by federal law.

IV. DUE PROCESS

The taxpayers argue that in imposing a REET as a condition to recording their transactions, the county violated their state and federal due process rights. In support, the taxpayers rely exclusively on *State ex rel. Baldwin v. Moore*, 7 Wash. 173, 34 P. 461 (1893). DOR responds that *Baldwin* is inapplicable, and that requiring payment of a REET as a condition to recording the assignment of the subleases does not violate due process. We agree with DOR.

*Baldwin* does not support the taxpayers' due process claims because the statutory procedures for contesting a tax did not exist when *Baldwin* was decided. There, the court held that a statute prohibiting the county auditor from filing a deed conveying property on which taxes remained unpaid was unconstitutional. *Baldwin*, 7 Wash. at 176. The court rejected the proposition that any constitutional infirmity in the statute could be cured where a plaintiff paid the tax and subsequently filed suit to recover the tax. *Id.* The dispositive issue in that case was the fact that there was "[n]o provision . . . made in the act whereby an interested party can test the validity of the tax, or the truthfulness of the record." *Id.* at 174. In *Thurston County v. Tenino Stone Quarries, Inc.*, 44 Wash. 351, 359, 87 P. 634 (1906), the court declined to extend the holding in *Baldwin* where there existed "an opportunity to test the legality of the tax."

Here, the legislature set forth several avenues by which a taxpayer can contest the imposition of an excise tax in RCW 82.32.150, .160,[10].170,[11] and .180. In approving the excise tax refund procedures in RCW 82.32.170 and .180 against a due process challenge, the supreme court in *Peters v. Sjoholm*, 95 Wn.2d 871, 877, 631 P.2d 937 (1981) held that "it is constitutionally

[10] RCW 82.32.160 provides an administrative procedure for challenging imposition of a tax.

[11] RCW 82.32.170 allows taxpayers to seek refunds directly from DOR without filing a lawsuit.

sound to postpone the opportunity for a hearing until after the payment of the delinquent taxes."

Therefore, *Baldwin* is distinguishable and the requirement that taxpayers pay a tax prior to

challenging the validity of the assessment does not violate the taxpayers' rights to due process. *See*

*id.*

### V. DISMISSAL OF CLASS ACTION REFUND CLAIMS

The taxpayers assert that the trial court erred in dismissing their class action claims because

it disregarded their causes of action seeking declaratory relief and improperly limited its focus to

ch. 82.32 RCW. Because the REET as imposed in this case was a valid tax, we need not consider

whether the trial court erred in dismissing the taxpayers' class action claims. Our decision on the

substantive issue renders this determination unnecessary.[12] *See Sheehan v. Cent. Puget Sound*

*Reg'l Transit Auth.*, 155 Wn.2d 790, 807, 123 P.3d 88 (2005) (holding that because the trial court's

order dismissing the appellants' substantive claims on summary judgment was affirmed, "the class

certification issue continues to be moot.").

### CONCLUSION

We hold that (1) the taxpayers' claims arise under RCW 82.32.180 and that they cannot

challenge imposition of the REET as applied to them under either RCW 82.32.150 or the UDJA.

We further hold that (2) the taxpayers did not meet their burden of establishing the correct amount

of tax owed under state law, (3) federal law does not preempt imposition of the REET, (4)

conditioning recording of the taxpayers' real estate transaction on payment of the REET does not

---

[12] Moreover, as we explain above in section I, *supra*, claims for a refund of an excise tax already paid must arise exclusively under RCW 82.32.180. In *Lacey*, the supreme court held that the requirements for requesting a refund under RCW 82.32.180 could never be satisfied "by unnamed and unidentified plaintiffs in a class action." 128 Wn.2d at 55. Consequently, class actions are not authorized in suits seeking refunds of excise taxes. *Id.* at 54.

violate constitutional rights to due process, and (5) because the tax was a valid tax, we need not address whether the trial court erred in dismissing the taxpayers' class action claims.

Accordingly, we affirm the trial court's orders dismissing the taxpayers' claims on summary judgment.

CRUSER, J.

We concur:

MAXA, P.J.

VELJACIC, J.